on March 6, 1990, or any further date established on that date.

e. If the Debtor fails to comply with any of the terms of paragraphs 4(a), (b), (c), or (d) herein, the Defendant shall provide notice of same to Debtor and her counsel. If the default is not cured within twenty (20) days and no order granting any dispensation on motion for good cause shown is granted, the Defendant may certify same to the court and obtain relief from the stay.

5. The hearing on Confirmation of the Debtor's Plan presently scheduled on February 14, 1990, is CANCELLED.

6. A hearing to consider Confirmation of any Amended Plan filed and to further consider whether relief from the automatic stay should be granted to the Defendant is scheduled on

TUESDAY, MARCH 6, 1990, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

7. No continuance of the hearing date set forth in paragraph six will be allowed.

8. This Order shall be filed and docketed in both the above-captioned main case and Adversary Proceeding.

**In re METROPOLITAN HOSPITAL, Debtor.**

**Bankruptcy No. 89–12542F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 14, 1990.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for movant, Dept. of Health and Human Services.

Marvin Krasny, Leonard P. Goldberger, Anthony J. Pasquariello, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for movant, Official Committee of Unsecured Creditors.

Lawrence J. Tabas, Spector, Cohen, Gadon & Rosen, Philadelphia, Pa., for debtor, Metropolitan Hosp.

William E. Kelleher, Jr., Robert P. Simons, Eckert Seamans Cherin & Mellott, Pittsburgh, Pa., for Provident Nat. Bank, Indenture Trustee.

Robert Levin, Myron Bloom, Adelman, Lavine, Gold & Levin, Philadelphia, Pa., for Official Bondholders Committee.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Two motions, raising similar issues, are now before me. The Secretary of Health and Human Services has filed a motion jointly with the official committee of unsecured creditors requesting that the automatic stay be lifted so that postpetition actions taken by HHS to reduce a prepetition medicare overpayment would be validated. The United States, on behalf of the Health Care Financing Administration (HCFA), also seeks relief from the stay to offset against this same prepetition medicare overpayment part of a postpetition payment due the debtor because the debtor was underpaid prepetition as a medicare provider.[1] Both motions are opposed by the official committee of bondholders and the indenture trustee; the debtor does not oppose either motion for relief.

I.

No trial was held on these motions as the parties preferred to submit a lengthy stipulation of all relevant facts, including documents, for the purpose of deciding these particular disputes only. I shall summarize this stipulation.

The debtor, Metropolitan Hospital, operates three discrete hospital facilities. Its current owners purchased what is now known as the Central Division in 1976; the Springfield and and Parkview divisions were purchased in 1981. All three hospitals were purchased with the proceeds derived from the issuance of two bond series. The 1976 series has a principal outstanding amount of $4,770,000.00, and the 1981 series has a principal outstanding amount of $54,000,000.00.

The bond financings resulted in the creation of a trust indenture (supplemented in 1981), which in turn contained security agreements. Not only are the buildings, furniture, and equipment collateral for the bondholders, but so are the debtor's "gross revenues" which include contract rights, insurance proceeds and general intangibles.

The debtor filed a voluntary petition in bankruptcy under chapter 11 on July 11, 1989 and has been operating all three divisions as debtor in possession ever since. As part of various cash collateral orders and stipulations, the secured creditors have received replacement liens in postpetition "gross revenues" generated by the debtor's operations.

On June 13, 1966, Metropolitan Hospital (which then consisted of only what is now known as the Central Division) entered into an agreement with the Secretary of Health, Education and Welfare (the department is

---

1. The governmental movants will be referred to collectively as the Secretary.

now known as HHS) to become a provider of services to medicare beneficiaries. On August 26, 1987, and September 8, 1987, the Springfield and Parkview Divisions respectively entered into a similar agreements.[2]

Rather than requiring hospitals to submit bills for services rendered to medicare patients and await their review prior to payment, the medicare program permits hospital providers to be repaid in at least two different ways. One method, utilized by the Central Division, requires that the hospital receive medicare reimbursements on a bi-weekly basis from periodic interim payments.[3] These payments are computed by estimating the medicare services the hospital is likely to provide over a fiscal year and its likely costs and expenses in providing those services, based upon the hospital's performance in prior years. (There is a process by which these periodic interim payments may be adjusted in midstream.) Because periodic interim payments are only estimates, a reconciliation is needed at the end of each fiscal year to determine the precise amount to which the hospital was entitled. This process requires the hospital to submit a cost report to the "intermediary" (the entity which actually tenders the payments to the hospital —here, Independence Blue Cross), which is then audited. As a result of the audit, a determination may be made that the hospital has either been underpaid or overpaid. *See* 42 U.S.C. § 1395g(a).

The second repayment method was utilized by Springfield and Parkview. A claim for repayment is filed by these hospitals with the intermediary whenever they treat a purportedly covered beneficiary. These claims are then paid without review but are later audited, and the necessary adjustments are then made.[4] Obviously, both methodologies are designed to provide prompt approximate payments to medicare providers with the expectation that a subsequent review will determine the provider's precise entitlement. *See generally United States v. Pisani*, 646 F.2d 83 (3d Cir.1981).

The debtor's fiscal year ends on June 30th. By some procedure at some time (which is not explained in the stipulation), the Secretary of HHS concluded that the debtor had been overpaid $2,561,321.00 for the fiscal years 1985 through 1987. In some manner also unexplained, this overpayment was reduced to $1,889,958.52 on March 16, 1989. The debtor then acknowledged its indebtedness to the Secretary and signed a promissory note to repay this sum, with interest, in monthly installments of $241,440.75.[5] By June 13, 1989, payments made by the debtor, along with further adjustments by the Secretary, had reduced the indebtedness to $1,165,306.27.

On June 30, 1989, before this bankruptcy case began, the Intermediary determined that the debtor had been underpaid by $726,636.00 for fiscal year 1989 and the debtor agreed that this underpayment could be applied to reduce its debt for the prior years. This reduced the debt to $473,857.20.[6]

A lingering dispute between the Secretary and medicare providers concerning the proper cost allocation for malpractice insurance, a dispute which had its origins in 1979, was resolved in May 1988 when the Secretary forwarded a settlement offer to hospital providers. Metropolitan accepted

---

2. These two hospitals had been medicare providers prior to 1987 but those agreements could not be located by the parties.

3. The parties also stipulated that certain periodic "pass through payments" are made based upon yearly estimates of hospital costs such as capital improvements, bad debts, and medical education.

4. Pass through payments are made under this approach as well.

5. Actually, an error was made as the promissory note listed the indebtedness at $1,888,781.11. The parties stipulated that the higher figure was correct.

6. Prior to this point the fact stipulation treats the medicare overpayment and its reduction as one amount, without allocation of any portion to the different hospital divisions. Once the overpayment was reduced to $473,857.20, the Secretary concluded that this was entirely attributable to the Central Division and concerns only fiscal year 1987.

the settlement in June 1988. However, the recalculation was not concluded until August 1989, after the chapter 11 petition was filed, when it was then determined that the debtor had been underpaid $361,055.00 for malpractice insurance costs incurred prior to fiscal year 1987. This underpayment has been allocated to the three divisions as follows: $171,747.00 to Central; $127,838.00 to Parkview; and $61,470.00 to Springfield.

On August 18, 1989 (again after the debtor's bankruptcy filing), the entire $361,055.00 was credited by the Secretary against the $473,953.63 prepetition debt, which left a balance outstanding of $112,898.63. As the debtor was entitled to an early August 1989 periodic interim payment of $479,368.00, the Secretary withheld from that payment $112,898.63 and thus repaid itself its entire prepetition debt.

These postpetition actions were noticed by the debtor and the unsecured creditors' committee. Under an agreement reached only by these three parties on September 13, 1989 (but not presented for approval to this court), the Secretary consented to repay to the debtor the $112,898.63 withheld and to seek court approval for any postpetition recovery of this amount. However, the $361,055.00 malpractice underpayment was retained by the Secretary with the parties agreeing to seek relief from the stay to support this action. Moreover, the debtor and unsecured creditors' committee agreed to raise no challenge to the Secretary's prepetition actions which resulted in a reduction of the debtor's medicare overpayment. Finally, the Secretary agreed to hasten the final audit for fiscal year 1988

and to tender any underpayment due the debtor by September 20, 1989.[7]

It is agreed that the $112,899.00 portion of the August 1989 periodic interim payment was returned to the debtor and that HCFA now seeks to recover that same sum from the fiscal year 1988 underpayment due the debtor.

## II.

As stated by the fact stipulation submitted by the parties, the joint motion of the Secretary and the official committee of unsecured creditors seeks "retroactive approval of the Settlement Agreement which sanctions the postpetition application of the aggregate pre-petition Malpractice settlement of $361,055.00 to Metropolitan's debt for fiscal years 1985 through 1987." Amended Stipulation ¶ 27. The additional motion of the United States seeks "relief from the automatic stay imposed by the filing under the Bankruptcy Code in order to setoff the $112,899.00 returned under the Settlement Agreement against the recently determined underpayment of $214,075.00 for fiscal year 1988 due to Metropolitan." Amended Stipulation ¶ 28. It is to these issues I now must turn.

Preliminarily, I note that the joint motion does not request that I approve the entire settlement agreement between the Secretary of HHS, the debtor and the unsecured creditors' committee. For example, in return for a prompt determination by the Secretary of the debtor's precise right to payment as a medicare provider for fiscal year 1988, the debtor and the unsecured creditors' committee agreed not to challenge the government's prepetition con-

---

7. As I read the fact stipulation, an underpayment for 1988 was indeed found in the amount of $214,075.00, but it is unclear from that document alone whether that sum has been tendered. In the Secretary's memorandum of law, at 4, ¶ 6, he clarifies this ambiguity by stating as follows:

On September 18, 1989, the intermediary determined that HCFA owed the Parkview division $538,070.00 and the Springfield division $97,362.00 for FY 1988. HCFA paid the amounts owed to Metropolitan on September 20, 1989 in response to Metropolitan's request to expedite payment to these two divisions.

The intermediary also determined that HCFA owed the Central Division $214,075.00 for FY 1988. On October 10, 1989, HCFA filed a proof of claim and requested relief from the automatic stay to setoff the remaining $112,899.00 of Metropolitan's debt from the $214,075.00 payment.

Thus, a portion of the fiscal year 1988 underpayment due the debtor, but attributable to Central only, has been retained by the Secretary pending the outcome of this contested matter. The balance of the underpayment was repaid to the debtor.

duct. The legitimacy of that portion of the agreement is not now before me. The joint motion itself does not seek approval of the entire settlement, and I note that Bankr.R. 9019 requires that settlements be approved on notice with an opportunity for a hearing. *See generally In re Neshaminy Office Bldg. Associates,* 62 B.R. 798, 803 (E.D.Pa. 1986). What is before me is only a portion of the settlement agreement—that which allowed the Secretary postpetition to retain the malpractice insurance underpayment and to seek recovery of a portion of the fiscal year 1988 underpayment.

■ Conversely, the attempt by the bondholders' committee and the indenture trustee to object to the Secretary's prepetition conduct simply by opposing these motions is also not before me. Bankruptcy Rule 7001(1) requires that actions to recover money or property be brought by adversary proceeding—that is, by complaint. Actions to recover money paid to a creditor as preferential fall within this requirement and thus are raised via adversary proceedings. *See generally* 9 *Collier on Bankruptcy* ¶ 7001.04 (15th ed.1989). Any issues concerning the standing of the bondholders' committee or the indenture trustee to bring such a suit, the immunity (if any) of the governmental defendants to such suit, *see generally Hoffman v. Connecticut Dept. of Income Maintenance,* —— U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), along with the merits of such a complaint would be addressed in the context of that proceeding.

■ To the extent that the Secretary or HCFA suggests that the official committee of bondholders, or the indenture trustee, does not have standing to oppose the instant motions, I disagree. First, 11 U.S.C. § 1109(b) expressly accords an official creditors' committee and an indenture trustee with the right to be heard on any issue in a chapter 11 case. *See generally In re Marin Motor Oil, Inc.,* 689 F.2d 445 (3d Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983). Second, the respondents here are contending that the sums which the movants desire to pay to the Secretary are collateral for the

outstanding bonds. No one but the bondholders and their indenture trustee would have any reason to assert such a position. Thus, they must have standing to do so. *See In re McKeesport Steel Castings Co.,* 799 F.2d 91 (3d Cir.1986). Third, to the extent that a portion of the settlement agreement is before me for approval, creditors and their representatives may be heard upon such issues. Since all creditors have an interest in the scope of the estate (except, perhaps, for secured creditors who will clearly be repaid in full by virtue of their collateral, *see also In re Wonder Corp. of America,* 70 B.R. 1018 (Bankr. D.Conn.1987)—and such repayment from collateral is not at all certain in this case), the wisdom of settlement agreements is open to their review. *See In re Neshaminy Office Bldg. Associates.* Therefore, the objections to these motions are properly before me.

### III.

The question of the right of the Secretary to undertake postpetition actions to recover prepetition overpayments to medicare providers is one that a number of courts have addressed. Typically, though, the issue has focused upon the Secretary's right to recover the prepetition medicare overpayment by reducing the size of postpetition interim payments due the debtor for the postpetition provision of medicare services. *E.g., In re Advanced Professional Home Health Care, Inc.,* 94 B.R. 95 (E.D.Mich.1988); *In re Memorial Hospital of Iowa County, Inc.,* 82 B.R. 478 (W.D. Wis.), *appeal dismissed,* 862 F.2d 1299 (7th Cir.1988); *In re Tidewater Memorial Hospital, Inc.,* 106 B.R. 876 (Bankr. E.D.Va. 1989); *In re St. Mary Hospital,* 89 B.R. 503 (Bankr. E.D.Pa.1988). The Secretary has uniformly asserted that he has a right to "recoup" from the postpetition payment the sum needed to reimburse the medicare trust fund for the prepetition overpayment. Indeed, the Secretary makes the same assertion in this dispute.

This position has significance because of the distinction between the terms "recoupment" and "setoff." The latter is ad-

dressed by statute, 11 U.S.C. § 553, while the former is an equitable doctrine engrafted into the bankruptcy code by decisional law. As the Third Circuit Court of Appeals has instructed:

> Both doctrines permitted countervailing claims, which otherwise could not have been asserted together, to be raised in a case based on any one of them. Both doctrines were subsequently adopted in bankruptcy, setoff by statute, and recoupment by decision, see *In re Monongahela Rye Liquors*, 141 F.2d 864 (3d Cir.1944). In bankruptcy, however, setoff and recoupment play a role very different from their original role as rules of pleading. Setoff, in effect, elevates an unsecured claim to secured status, to the extent that the debtor has a mutual prepetition claim against the creditor. *See* 11 U.S.C. § 506(a). Setoff is limited, however, by the provisions of 11 U.S.C. § 553. Among those limitations is that pre-petition claims against the debtor cannot be setoff against post-petition debts to the debtor. Recoupment, on the other hand, allows the creditor to assert that certain mutual claims extinguish one another in bankruptcy, in spite of the fact that they could not be "setoff" under 11 U.S.C. § 553. The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable. *See In re Monongahela Rye Liquors*, 141 F.2d at 869.

*Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984). *Accord, In re B & L Oil Co.*, 782 F.2d 155 (10th Cir.1986).

The distinction between recoupment and setoff is usually meaningful in the medicare overpayment context because the Secretary typically desires to utilize postpetition payments to recover on its prepetition claim. Only the right to recoupment would permit the Secretary to so act, because no setoff is permitted against postpetition payments to repay a prepetition debt. *Lee v. Schweiker; In re Tidewater Memorial Hospital, Inc.*

To support its asserted right of recoupment, the Secretary usually offers two theories. One is that the recoupment right is statutory and is derived from the federal medicare provisions. *See generally In re Memorial Hospital of Iowa County, Inc.*, 82 B.R. at 482; *In re Neuman*, 55 B.R. 702, 706 (S.D.N.Y.1985). The second approach is that there is a contractual right to recoupment. This contractual right is preserved, the Secretary uniformly argues, because the medicare provider contract is executory and the debtor has either expressly or impliedly assumed the contract. *See generally In re Advanced Professional Home Health Care, Inc.; In re Monsour Medical Center*, 11 B.R. 1014 (W.D.Pa. 1981); *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr.S.D.N.Y. 1982), *aff'd*, 34 B.R. 385 (S.D.N.Y.1983).[8]

The motions now before me do not require that I delve into this thicket and determine whether the Secretary possesses a right of recoupment. The parties to this dispute overlook the fact that here no recovery from postpetition medicare payments due the debtor is now sought. The Secretary returned this offset to the estate and is now looking to recover against funds due the debtor because of prepetition underpayments made to it. Those prepetition underpayments occurred in the fiscal years 1985 through 1987 for malpractice insurance costs, and in fiscal year 1988 because the periodic interim payments for that year proved too low upon audit review.

■ To the extent the bondholders' committee and the indenture trustee contend that the debt owed to Metropolitan Hospital from the Secretary arose postpetition,

---

**8.** The court in *In re Dartmouth House Nursing Home, Inc.*, 24 B.R. 256 (Bankr.D.Mass.1982) construed the medicaid provider agreements in that dispute as establishing yearly executory contracts, thus precluding underpayments in one fiscal year from being used to offset overpayments in another year. *See also In re Tidewater Memorial Hospital, Inc.*, 106 B.R. at 882 n. 4.

thereby precluding setoff, I must disagree. While it is undisputed that a final determination of underpayment was made postpetition, the debtor's "claim" against the Secretary arose prepetition and is property of the estate under 11 U.S.C. § 541(a). *See generally In re Morris*, 45 B.R. 350, 351 (E.D.Pa.1984) (property interests included within 11 U.S.C. § 541(a) are "extremely broad" and would encompass right to have governmental funds be used to offset accrued postpetition utility charges). All the medicare services and the costs attendant thereto occurred prepetition. The debtor's assertions of right to payment, both for the malpractice cost as well as its cost reporting for fiscal year 1988, were made prepetition. Had the debtor ceased to operate on July 11, 1989 when it filed its bankruptcy petition, there is little doubt that the estate would be entitled to receive the underpayments. Thus, the fact that the Secretary's final determination was made postpetition, and that such a determination was a predicate to any cause of action which the debtor or the Secretary may have, *see generally United States v. Pisani*, does not alter the fact that the debtor's right to payment, contingent as it might have been, existed at the time of the commencement of this bankruptcy case. *See In re Remington Rand Corp.*, 836 F.2d 825 (3d Cir.1988) (claim arose for bankruptcy purposes prior to government's final audit). *See also In re Clinton Centrifuge, Inc.*, 81 B.R. 844 (Bankr.E.D.Pa.1988).

My conclusion that the Secretary's obligation to the debtor is a prepetition asset of the estate distinguishes this dispute from those reported decisions discussing the Secretary's ability to recover a medicare overpayment from postpetition periodic interim payments. *See, e.g., In re Monsour Medical Center*. No court has suggested that the debts owed by the Secretary and the medicare provider are not "mutual" for purposes of setoff. No court has suggested that the Secretary may not utilize § 553 to setoff prepetition medicare overpayments and underpayments. *Accord, In re Dartmouth House Nursing Home, Inc.*, 24 B.R. at 264–66 (setoff permitted). *Cf. Lee v. Schweiker* (although recoupment was not appropriate, individual debtor's social security underpayment and overpayment which arose prepetition may be setoff).[9]

As to the motion of HCFA for relief from the stay to setoff, postpetition, $112,898.63 from a larger sum due the debtor as an underpayment for fiscal year 1988, there is no basis under § 553 to deny this request.[10] *In re Dartmouth House Nursing Home, Inc.* Moreover, no adequate protection has been offered by any party in interest in favor of the movant's secured interest if it were compelled to pay this sum to the estate. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *Lee v. Schweiker*, 739 F.2d at 877 n. 14; *In re Dartmouth House Nursing Home, Inc.*, 24 B.R. at 265–66.[11] Absent the assertion of a prior lien in this underpayment fund by the objecting bondholders and their indenture trustee, which will be discussed below, the motion should be granted.

■ The question whether to grant the joint motion to permit the Secretary to retain the $361,055.00 malpractice cost underpayment is complicated by two separate issues. The prepetition overpayment claim

---

**9.** My colleague, Judge Scholl, has concluded that the provisions of 11 U.S.C. § 525(a) would preclude the Secretary from using postpetition medicare provider payments to recover a prepetition overpayment debt. *In re University Medical Center*, 93 B.R. 412 (Bankr.E.D.Pa. 1988); *In re St. Mary Hospital*. Whether that appproach is correct, *but see Watts v. Pennsylvania Housing Fin. Co.*, 876 F.2d 1090 (3d Cir. 1989); *In re Saunders*, 105 B.R. 781, 786–88 (Bankr.E.D.Pa.1989), I need not now decide. Given provisions such as 11 U.S.C. § 506(a) which equate the right of setoff to a prepetition secured claim, there is no suggestion in *St. Mary* 

*Hospital* that a governmental creditor's attempt to recover on its secured claim would run afoul of § 525(a).

**10.** None of the exceptions established by 11 U.S.C. § 553(a) are applicable. *See generally In re Aspen Data Graphics, Inc.*, 109 B.R. 677, (Bankr.E.D.Pa.1990).

**11.** In fact, if HCFA were required to pay these funds to the estate, its ability to recover its claim would then be based upon the contentious recoupment issue.

of $473,953.63, held by the Secretary, has been apportioned solely to the Central Division of the debtor. While the amount of the 1988 underpayment currently in the possession of the Secretary is attributable solely to the Central Division as well (the 1988 underpayment attributable to the other two divisions has been paid over to the debtor in accordance with the stipulation), the malpractice cost underpayment is attributable to all three divisions. Indeed, of the total sum, the parties agree that roughly $190,000.00 concerns services rendered by hospitals other than Central. Therefore, the objectors contend that sums due these hospitals cannot be used to offset the overpayment derived from the Central Division. Their reliance upon the *Tidewater* decision, though, is misplaced.

The court in *Tidewater* only concluded that the more restrictive principle of recoupment would not apply when the debtor hospital was a party to three different provider agreements (hospital services, home health services, and skilled nursing facilities) and the Secretary was attempting to *recoup* postpetition payments due under one contract against prepetition overpayments made under a different contract. Such a conclusion may follow from the Secretary's executory contract approach. Setoff, however, is appropriate when the debtor itself is but one corporation operating three hospitals, and the debtor, along with the Secretary, prepetition evidenced a clear intent to treat the medicare overpayment obligation of the three divisions as one debt. This intent is manifest from the single promissory note signed in March 1989, and the debtor's acquiescence in permitting its entire fiscal year 1989 underpayment to be used in June 1989 to reduce its overpayment. *Compare WJM, Inc. v. Massachusetts Dept. of Public Welfare*, 840 F.2d 996 (1st Cir.1988) (setoff against different corporation under common ownership would not be permitted where corporate formalities were kept, thereby establishing truly distinct legal entities).

The second issue concerns the request in the joint motion for retroactive vindication of the action. Clearly, the better practice (if not the procedure mandated by the bankruptcy code, *see In re Memorial Hospital of Iowa County, Inc.*) is to seek prior court approval for any postpetition offset.[12] Although I appreciate this argument, if the Secretary is entitled to setoff it would be inappropriate to deny him relief solely because of his request for *nunc pro tunc* approval, at least on the record currently before me. *In re Dartmouth House Nursing Home, Inc.*, 24 B.R. at 263.

This is not a situation where the Secretary has acted unilaterally and required other parties to raise the issue of the automatic stay and incur those litigation costs. The Secretary is bringing the instant motion with the consent of the debtor and unsecured creditors; thus, it is not ignoring the automatic stay. Furthermore, bankruptcy courts do possess the power to "annul" the automatic stay, thereby granting *nunc pro tunc* relief. 11 U.S.C. § 362(d). *See generally In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984); *In re Purnell*, 92 B.R. 625, 630 (Bankr.E.D.Pa.1988). Such relief is appropriate here for a number of reasons. Not only is the entitlement of the Secretary in this situation not clear (that is, in the instant case it is not readily apparent whether setoff or recoupment applies and whether relief from the stay is necessary to recoup), *cf. United States v. Norton*, 717 F.2d 767, 775 (3d Cir.1983) (penalty for violating the automatic stay is inappropriate where law concerning right to setoff unclear), but the damage caused to the estate if the setoff is valid under § 553 would be insubstantial. In addition, there has been no attempt by the Secretary to deprive the debtor of needed revenues to reorganize. Here, the amount of the setoff

12. The code clearly requires that a creditor obtain relief from the stay to setoff a debt by postpetition conduct. 11 U.S.C. § 362(a)(7). Whether relief from the stay is needed in order to validly recoup postpetition is an issue that has divided courts. *Compare In re Memorial Hospital of Iowa County, Inc.* (court approval is needed) *with In re Hiler*, 99 B.R. 238 (Bankr.D.N.J.1989) (relief from stay is not required). *See generally In re Tidewater Memorial Hospital, Inc.*, 106 B.R. at 881 n. 3 (and cases cited).

represents a very small fraction of the debtor's postpetition income, and the setoff was done with the consent of the debtor as part of the resolution of a number of matters. *Compare In re Dartmouth House Nursing Home, Inc.* (court has the equitable power to deny setoff request when denial of revenues would significantly harm any prospect for reorganization).

Finally, the lien assertion of the objectors to the setoff funds makes any denial of the annulment of the stay problematic. Were I to order the Secretary to return the funds to the estate, the objectors may have a stronger interest in those funds once they are in the debtor's hands. *But see In re Visiting Nurse Association,* 101 B.R. 462 (Bankr.W.D.Pa.1989) (overpaid funds held by the debtor are in constructive trust in favor of the Secretary). The Secretary's recovery on its claim if the setoff funds were returned to the debtor may then be dependent upon its recoupment theory. Conversely, if the Secretary has the stronger interest in the underpayment so long as those funds remain in its possession, its request for validation of its actions should not be denied because of the procedural posture by which this dispute arose.

In sum, the joint motion for relief from the stay and approval of the postpetition setoff will be granted unless the objectors possess a stronger interest in those funds by virtue of their security interests in the debtor's estate.

### IV.

■ In some respects, it is the question of lien priority that is paramount in this dispute. Underlying the objectors' position is their belief that the bondholders or the indenture trustee hold a duly perfected lien in all medicare underpayments, and that this lien is superior to any rights which the Secretary may possess by virtue of the medicare overpayment made to the debtor. They assert that a creditor with a valid prepetition lien in contract rights, accounts

receivables, and intangible property has priority over the "secured" position of a creditor with a right of setoff, when that right is sought subsequent to the perfection of the voluntary security interest.

Initially, the objectors argue that they hold a valid perfected security interest in the debtor's right to receive compensation under 42 U.S.C. § 1395g because the debtor was underpaid as a medicare provider. There is support for the position that a valid lien may be granted in the right to receive such payments, *Matter of Missionary Baptist Foundation, Inc.,* 796 F.2d 752 (5th Cir.1986); *In re American Care Corp.,* 69 B.R. 66 (Bankr.N.D.Ill.1986), and the Secretary does not contend otherwise. The objectors then go on and posit that under the Uniform Commercial Code, as enacted in Pennsylvania, their interest in the medicare underpayments due the debtor prevails over the Secretary's interest because their interest arose first and was duly perfected, thus giving notice to the Secretary. For support, the objectors rely upon *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.,* 882 F.2d 615 (2d Cir.1989) and *Griffin v. Continental American Life Ins. Co.,* 722 F.2d 671 (11th Cir.1984).[13]

Both *MNC* and *Griffin* were diversity cases which followed state appellate court decisions of New York and Georgia, respectively, in interpreting their states' UCC. In *Griffin,* the Court of Appeals construed Georgia law as granting priority to a perfected security interest over an earlier arising right of setoff. This result has been criticized as in conflict with UCC § 9–318, as interpreted by its official comment. Note, *Conflicts Between Set–Offs and Article 9 Security Interests,* 39 Stan.L.Rev. 235, 257–260 (1986). In *MNC,* the Court of Appeals for the Second Circuit concluded that under New York law, as found in its UCC, a creditor with a perfected security interest in accounts receivables prevailed over an "account debtor" who attempted to

---

**13.** Citation is also made to *Citibank (New York State), N.A. v. Interfirst Bank,* 784 F.2d 619 (5th Cir.1986). This last decision, though, discusses Texas law and its "equitable rule" regarding bank setoffs. I do not understand the objectors to suggest that the "equitable rule" should be applicable here.

later setoff a debt owed to a subsidiary of the account debtor.

In offering this argument, the instant objectors are assuming that the UCC governs this dispute. In so doing, they overlook *Rochelle v. United States*, 521 F.2d 844 (5th Cir.1975), *modified on other grounds*, 526 F.2d 405 (5th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976), which permitted the United States to setoff a tax refund due a debtor partner against a tax liability of the non-debtor partnership. The bankruptcy trustee had opposed the setoff because creditors of the partnership were subordinate to creditors of the partner and argued that the partner's estate had a prior claim to the refund. The Fifth Circuit viewed the right of setoff as an equitable provision of federal bankruptcy law that did not contain any exception for subordinated claims. The holding of *Rochelle* was recently cited in *In re Sound Emporium, Inc.*, 70 B.R. 22 (W.D.Tex.1987) to permit the United States to setoff its unpaid tax claim against funds due the debtor's estate from two contracts involving the United States Army. This setoff was permitted over the opposition of a creditor with a prior perfected security interest in the debtor's accounts receivables, including the Army contracts. *Accord In re Defense Services, Inc.*, 104 B.R. 481, 485–86 (Bankr. S.D.Fla.1989) (it is irrelevant to bankruptcy setoff rights that creditor seeking setoff is subordinated to another creditor regarding the funds offset).[14]

Not only are the objectors implicitly requesting that *Rochelle* and its adherents be rejected, they are also assuming that provisions of the Uniform Commercial Code such as § 9–318 apply to the federal government's right of setoff. Clearly this right of setoff stems from common law, in addition to whatever statutory provisions exist. *See United States v. Tafoya*, 803 F.2d 140, 141 (5th Cir.1986). Whether the appropriate common law should be federal common law for the medicare program setoffs is certainly arguable, if not ordained, in light of decisions such as *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *Accord Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Given the structure and purpose of the federal medicare program, it is debatable whether the federal common law would incorporate state priority law in limiting the government's right of setoff. *United States v. Kimbell Foods, Inc. Compare United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) (government's setoff rights asserted against contractor's retainage prevails over claim of surety to retainage) *with Glassman Constr. Co. v. Fidelity & Casualty Co.*, 356 F.2d 340 (D.C.Cir.), *cert. denied*, 384 U.S. 987, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966) (claim of surety to subcontractor's retainage prevailed over setoff rights of private prime contractor). *See also In re Commercial Reprographics, Inc.*, 95 B.R. 174 (Bankr.E.D.Cal.1988) (state right of setoff prevails against secured creditor). As discussed in *Kimbell Foods, Inc.*, a uniform federal common law of setoff might borrow from the priority doctrine concerning federal tax liens, *see United States v. New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954), which requires that the state created lien be "choate" before the federal lien arises in order to obtain priority. "A state created lien is not choate until the 'identity of the lienor, the property subject to the lien, and the amount of the lien are established.'" *United States v. Kimbell Foods, Inc.*, 440 U.S. at 721, 99 S.Ct. at 1455 (quoting *United States v. New Britain*, 347 U.S. at 84, 74 S.Ct. at 369). Were this more restrictive

---

**14.** In *MNC*, the entity to whom funds were owed was a debtor in bankruptcy. The bankruptcy court had granted relief from the automatic stay and the secured creditor thereafter brought suit under federal diversity jurisdiction against the account debtor. While the Court of Appeals concluded that bankruptcy law was irrelevant to a resolution of that civil action, it also acknowledged that under bankruptcy law, the debt of a subsidiary may not be used to offset the debt owed to the parent. Thus, there was no suggestion that bankruptcy law would have permitted the setoff in question. 882 F.2d at 618 n. 2. Therefore, the holding in *MNC* does not implicitly disapprove of *Rochelle*.

standard applicable, it is unlikely that the lien of the objectors in the medicare underpayment became choate prior to the Secretary's setoff right.

Furthermore, if I were to conclude that the provisions of the UCC did apply, either directly or through incorporation by federal common law, the objectors' lien would not take precedence over the Secretary's rights under the various provisions of UCC § 9–318. First, if one would assume that the Secretary's right to offset the underpayment due the debtor arose after the "notice of assignment" to the objectors of the debtor's interest in those medicare provider payments, § 9–318(a)(1) (13 Pa.C.S.A. § 9318(a)(1)) would permit the Secretary to prevail if one characterizes the offset as that of recoupment or as related to the contract regarding medicare provider services. *See* 9 Anderson *Uniform Commercial Code* § 9–318.25 (1985). To the extent an account debtor has a right of recoupment, or to the extent that the offset arises out of the contract creating the account debt, such right of offset prevails over any secured creditor, regardless of notice or date of perfection. *First National Bank v. Master Auto Service Corp.,* 693 F.2d 308 (4th Cir.1982); *Ertel v. Radio Corp. of America,* 261 Ind. 573, 307 N.E.2d 471 (1974); *Producers Cotton Oil Co. v. Amstar Corp.,* 197 Cal.App.3d 638, 242 Cal. Rptr. 914 (1988). As I noted previously, a number of courts have concluded that the Secretary does indeed possess such a right under the medicare provider program.

Second, the objectors implicitly suggest that the provisions of § 9–318(b) (13 Pa.C.S.A. § 9318(b)) are not relevant. By virtue of this subsection, an assignor (here the debtor) and an account debtor (the Secretary) may modify their rights under the contract if "made in good faith and in accordance with reasonable commercial standards" and such modification is effective against an assignee with rights under the contract (the objectors). The parties' stipulation permitting the Secretary to setoff the debtor's underpayments, which contained various provisions beneficial to the debtor, could well represent such a modifi-

cation, thereby supporting the Secretary's position.

Finally, there is subsection 9–318(a)(2) (13 Pa.C.S.A. § 9318(a)(2)). A right of setoff which arises before the notification of the account assignment prevails over the rights of the assignee. The purpose is to declare that at the time of perfection of the lien, the assignee obtains the same right to be paid under the contract that the assignor possessed at that time. Here, the indenture trusts which created a security interest in "gross revenues" were executed in 1976 and 1981. When those indentures were executed and recorded, the debtor had no rights as a medicare provider in the years 1985 to 1988, the years for the underpayments in question. Not having provided services yet, the debtor accrued no right to payment. Clearly, the indentures sought to lien future gross revenues. But the medicare statute was also clear at that time, as it is now, 42 U.S.C. § 1395g, that all provider payments were subject to adjustment on account of prior overpayments. This statutory provision, which was known (or should have been known) to the secured bondholders at the time the trust indentures were executed, is a defense to which an assignee is subject under § 9–318(a)(2) (13 Pa.C.S.A. § 9318(a)(2)). *See generally Glassman Constr. Co. v. Fidelity & Casualty Co.* Having known of this limitation on provider payments at the inception of their security interest, the bondholders cannot now seek to claim priority over the government's statutory setoff.

### V.

In conclusion, there are a variety of approaches which may be considered when analyzing the priority rights of the Secretary and the bondholders to the underpayment currently in the Secretary's possession. No approach supports the bondholders' assertion that they have a stronger claim to receive the underpayment than the Secretary. *See In re Visiting Nurse Association,* 101 B.R. at 465 (secured creditor ordered to return to the Secretary medicare overpayment which it obtained from debtor). Furthermore, the recovery by the Secretary of a portion of the debtor's under-

payment for prepetition services rendered violates no bankruptcy principles. Therefore, there is no basis upon which to sustain the objections to these motions. An appropriate order shall be entered.

## ORDER

AND NOW, this 14th day of February, 1990, upon consideration and for the reasons set forth in the accompanying Memorandum Opinion, the motion for relief from the automatic stay filed jointly by the Secretary of Health and Human Services and the Official Committee of Unsecured Creditors is GRANTED, thereby approving that portion of a postpetition settlement agreement that allowed the Secretary, postpetition, to retain certain underpayments.

Further, the motion for relief brought on behalf of the Health Care Financing Administration is also GRANTED.