**In re METROPOLITAN HOSPITAL, Debtor.**

Civ. A. No. 90–1990.
Bankruptcy No. 89–12542F.

United States District Court,
E.D. Pennsylvania.

Aug. 23, 1991.

Robert H. Levin, Adelman Lavine Gold & Levin, Philadelphia, Pa., for debtor.

## MEMORANDUM

LUDWIG, District Judge.

The Official Bondholders Creditor's Committee and the Indenture Trustee appeal from the bankruptcy court's order dated February 14, 1990. The order, which granted relief from the automatic stay, permitted the Secretary of Health and Human Services to retain, postpetition, certain payments due for prepetition medicare services.[1]

### I.

The following facts, as stipulated to by the parties, were summarized by the bankruptcy court:

> The debtor, Metropolitan Hospital, operates three discrete hospital facilities. Its current owners purchased what is now known as the Central Division in 1976; the Springfield and Parkview divisions were purchased in 1981. All three hospitals were purchased with the proceeds derived from the issuance of two bond series. The 1976 series has a principal outstanding amount of $4,770,-000.00, and the 1981 series has a principal outstanding amount of $54,000,-000.00.
>
> The bond financings resulted in the creation of a trust indenture (supplemented in 1981), which in turn created security agreements. Not only are the buildings, furniture, and equipment collateral for the bondholders, but so are the debtor's "gross revenues" which in-

---

**1.** Jurisdiction is 28 U.S.C. § 158(a). Review of legal conclusions is plenary. The clearly erroneous standard applies to findings of fact. *See* *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.,* 891 F.2d 66, 69 (3d Cir.1989).

clude contract rights, insurance proceeds and general intangibles.

The debtor filed a voluntary petition in bankruptcy under chapter 11 on July 11, 1989 and has been operating all three divisions as debtor in possession ever since. As part of various cash collateral orders and stipulations, the secured creditors have received replacement liens in postpetition "gross revenues" generated by the debtor's operations.

On June 13, 1966, Metropolitan Hospital (which then consisted of only what is now known as the Central Division) entered into an agreement with the Secretary of Health, Education and Welfare (the department is now known as HHS) to become a provider of services to medicare beneficiaries. On August 26, 1987, and September 8, 1987, the Springfield and Parkview Divisions respectively entered into similar agreements.[2]

Rather than requiring hospitals to submit bills for services rendered to medicare patients and await their review prior to payment, the medicare program permits hospital providers to be repaid in at least two different ways. One method, utilized by the Central Division, requires that the hospital receive medicare reimbursements on a bi-weekly basis from periodic interim payments.[3] These payments are computed by estimating the medicare services the hospital is likely to provide over a fiscal year and its likely costs and expenses in providing those services, based upon the hospital's performance in prior years. (There is a process by which these periodic interim payments may be adjusted in midstream.) Because periodic interim payments are only estimates, a reconciliation is needed at the end of each fiscal year to determine the precise amount to which

the hospital was entitled. This process requires the hospital to submit a cost report to the "intermediary" (the entity which actually tenders the payments to the hospital—here Independence Blue Cross), which is then audited. As a result of the audit, a determination may be made that the hospital has either been underpaid or overpaid. *See* 42 U.S.C. § 1395g(a).

The second repayment method was utilized by Springfield and Parkview. A claim for repayment is filed by these hospitals with the intermediary whenever they treat a purportedly covered beneficiary. These claims are then paid without review but are later audited, and the necessary adjustments are then made.[4] Obviously, both methodologies are designed to provide prompt approximate payments to medicare providers with the expectation that a subsequent review will determine the provider's precise entitlement. *See generally United States v. Pisani*, 646 F.2d 83 (3d Cir.1981).

The debtor's fiscal year ends on June 30th. By some procedure at some time (which is not explained in the stipulation), the Secretary of HHS concluded that the debtor had been overpaid $2,561,321.00 for the fiscal years 1985 through 1987. In some manner also unexplained, this overpayment was reduced to $1,889,958.52 on March 16, 1989. The debtor then acknowledged its indebtedness to the Secretary and signed a promissory note to repay this sum, with interest, in monthly installments of $241,440.75.[5] By June 13, 1989, payments made by the debtor, along with further adjustments by the Secretary, had reduced the indebtedness to $1,165,306.27.

On June 30, 1989, before this bankruptcy case began, the Intermediary de-

---

2. "These two hospitals had been medicare providers prior to 1987 but those agreements could not be located by the parties." Footnotes 2–7 appear, as such, in the bankruptcy court opinion. *See In re Metropolitan*, 110 B.R. 731, 733–34 nn. 2–7 (Bankr.E.D.Pa.1990).

3. "The parties also stipulated that certain periodic 'pass through payments' are made based upon yearly estimates of hospital costs such as

capital improvements, bad debts, and medical education."

4. "Pass through payments are made under this approach as well."

5. "Actually, an error was made as the promissory note listed the indebtedness at $1,888,781.11. The parties stipulated that the higher figure was correct."

termined that the debtor had been underpaid by $726,636.00 for fiscal year 1989 and the debtor agreed that this underpayment could be applied to reduce its debt for the prior years. This reduced the debt to $473,857.20.[6]

A lingering dispute between the Secretary and medicare providers concerning the proper cost allocation for malpractice insurance, a dispute which had its origins in 1979, was resolved in May 1988 when the Secretary forwarded a settlement offer to hospital providers. Metropolitan accepted the settlement in June 1988. However, the recalculation was not concluded until August 1989, after the chapter 11 petition was filed, when it was then determined that the debtor had been underpaid $361,055.00 for malpractice insurance costs incurred prior to fiscal year 1987. This underpayment has been allocated to the three divisions as follows: $171,747.00 to Central; $127,838.00 to Parkview; and $61,470.00 to Springfield.

On August 18, 1989 (again after the debtor's bankruptcy filing), the entire $361,055.00 was credited by the Secretary against the $473,953,63 prepetition debt, which left a balance outstanding of $112,898.63. As the debtor was entitled to an early August 1989 periodic interim payment of $479,368.00, the Secretary withheld from that payment $112,898.63 and thus repaid itself its entire prepetition debt.

These postpetition actions were noticed by the debtor and the unsecured creditors' committee. Under an agreement reached only by these three parties on September 13, 1989 (but not presented for approval to this court), the Secretary consented to repay the debtor the $112,898.63 withheld and to seek court approval for any postpetition recovery of this amount. However, the $361,055.00 malpractice underpayment was retained by the Secretary with the parties agreeing to seek relief from the stay to support this action. Moreover, the debtor and unsecured creditors' committee agreed to raise no challenge to the Secretary's prepetition actions which resulted in a reduction of the debtor's medicare overpayment. Finally, the Secretary agreed to hasten the final audit for fiscal year 1988 and to tender any underpayment due the debtor by September 20, 1989.[7]

It is agreed that the $112,899.00 portion of the August 1989 periodic interim payment was returned to the debtor and that HCFA now seeks to recover that same sum from the fiscal year 1988 underpayment due the debtor.

*In re Metropolitan Hospital*, 110 B.R. 731, 732–34 (Bankr.E.D.Pa.1990).

## II.

The Bondholders Committee and the Indenture Trustee contend that their security interests in the payments owed Metropolitan—$361,055 for the malpractice settlement and $112,898.63 for medicare underpayments—are senior to any setoff right of

---

6. "Prior to this point the fact stipulation treats the medicare overpayment and its reduction as one amount, without allocation of any portion to the different hospital divisions. Once the overpayment was reduced to $473,857.20, the Secretary concluded that this was entirely attributable to the Central Division and concerns only fiscal year 1987."

7. "As I read the fact stipulation, an underpayment for 1988 was indeed found in the amount of $214,075.00, but it is unclear from that document alone whether that sum has been tendered. In the Secretary's memorandum of law, at 4, ¶ 6, he clarifies this ambiguity by stating as follows:

On September 18, 1989, the intermediary determined that HCFA owed the Parkview division $538,070.00 and the Springfield division $97,362.00 for FY 1988. HCFA paid the amounts owed to Metropolitan on September 20, 1989 in response to Metropolitan's request to expedite payment to these two divisions. The intermediary also determined that HCFA owed the Central Division $214,075.00 for FY 1988. On October 10, 1989, HCFA filed a proof of claim and requested relief from the automatic stay to setoff the remaining $112,899.00 of Metropolitan's debt from the $214,075.00 payment.

Thus, a portion of the fiscal year 1988 underpayment due the debtor, but attributable to Central only, has been retained by the Secretary pending the outcome of this contested matter. The balance of the underpayment was repaid to the debtor."

the Secretary. Indenture Trustee's brief at 13.[8]

### A.

█ It is well known that the filing of a Chapter 11 petition imposes an automatic stay. 11 U.S.C. § 362(a). "The stay prohibits creditors from taking any actions, judicial or extra-judicial, outside of the bankruptcy proceeding to recover amounts owed by the debtor. 11 U.S.C. § 362(a)." *University Medical Center v. Sullivan,* 122 B.R. 919, 925 (E.D.Pa.1990), *clarified on denial of reconsideration,* 125 B.R. 121 (E.D.Pa.1991). However, a creditor that obtains relief from the stay may set off a prepetition debt owed by the debtor against a prepetition debt owed by the creditor. 11 U.S.C. § 553(a).[9] *See University Medical Center,* 122 B.R. at 925.

█ Setoff, as a federal bankruptcy law concept, applies when a debtor and a creditor have mutual prepetition claims against one another. This equitable doctrine "allows parties that owe mutual debts to state the accounts between them, subtract one from the other and pay only the balance." *Matter of Bevill, Bresler & Shulman Asset Mgmt. Corp.,* 896 F.2d 54, 57 (3d Cir. 1990). "Setoff is commonly viewed as a type of preference permitted by statute. That is, without the provisions of § 553 (and § 506), any attempt to offset a mutual debt between a creditor and a debtor arguably would amount to a preference under § 547 and could, therefore, be avoided." *In re Aspen Data Graphics, Inc.,* 109 B.R. 677, 683 (Bankr.E.D.Pa.1990).

Here, the bankruptcy court concluded that although "a final determination of underpayment was made postpetition, the debtor's claim against the Secretary arose prepetition and is property of the estate under 11 U.S.C. § 541(a)." *Metropolitan,* 110 B.R. at 737.

█ The Bankruptcy Code defines "claim" as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). *See, e.g., In re High Sierra Transport, Inc.,* 101 B.R. 432, 436–37 (Bankr.M.D.Pa.1989) ("Section 553 does not prohibit setoff of a creditor's claim arising prepetition, unliquidated or unmatured as of the petition date, against a creditor's prepetition liability").[10] *See also In re Dartmouth Nursing Home, Inc.,* 24 B.R. 256, 264 (Bankr.D.Mass.1982), *aff'd,* 1985 WL 17642 (D.Mass. Sept. 25, 1985) (debts and credits that arose from prepetition activities were the subject of a valid setoff).[11] Given these principles, the malpractice settlement and the debt due under the promissory note meet the prepetition mutuality requirement for setoff.[12]

### B.

The Secretary contends that the doctrine of recoupment, and not setoff applies. Sec'y brief at 12–16. Recoupment, the Secretary maintains, would permit recovery "from the postpetition payment the sum needed to reimburse the medicare trust

---

8. The Bondholders Committee joined in the arguments presented by the Indenture Trustee. *See* Bondholders' brief at 8.

9. "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...." 11 U.S.C. § 553(a).

10. *See also In re Remington Rand Corp.,* 836 F.2d 825, 831–32 (3d Cir.1988) (claim arose for bankruptcy purposes prior to government's final

audit); *In re Morris,* 45 B.R. 350, 351 (E.D.Pa. 1984) (property interests included within 11 U.S.C. § 541(a) are "extremely broad" and would encompass right to have governmental funds be used to offset accrued postpetition utility charges).

11. Where the relevant debt and credit do not both arise prepetition, setoff is inapplicable. *See Dartmouth,* 24 B.R. at 263.

12. "On appeal, the Bondholders Committee does not contend that Judge Fox erred in concluding that the Secretary was seeking to setoff mutual prepetition debts against the Debtor." Bondholders' brief at 7.

fund for the prepetition overpayment." *Metropolitan*, 110 B.R. at 735.

■ Recoupment and setoff are distinct doctrines, both founded in equity. Recoupment permits a creditor to recover prepetition overpayments by deducting funds from postpetition payments due the debtor. *See Long Term Disability Plan of Hoffman–LaRouche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 241–44 (Bankr. N.J.1989). While recoupment deals with situations in which a single transaction is at issue, setoff applies where the debt and credit arise from different transactions between the same parties. *See Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984); *Westinghouse Elec. Corp. v. Fidelity Deposit Co. of Maryland*, 63 B.R. 18, 21 (E.D.Pa.1986); *In re Hiler*, 99 B.R. at 241 ("Setoff involves mutuality of obligation which arises from separate transactions"). "Unlike setoff, which can apply to unrelated obligations, recoupment applies where the creditor's claim against the debtor arises from the same transaction and is 'essentially a defense to the debtor's claim ... rather than a mutual obligation.'" *University Medical Center*, 122 B.R. at 925 (citing *Lee*, 739 F.2d at 875).[13]

■ Here, the Secretary would recoup prepetition overpayments from the malpractice insurance and medicare underpayments. Recoupment, however, is inappropriate for the reason that the offsets do not arise from a single transaction. The overpayments involved medicare services rendered in fiscal years 1985–1987, while the underpayments resulted from pre–1987 malpractice insurance costs and medicare services rendered in fiscal year 1988. *See*

*Metropolitan*, 110 B.R. at 734. *See also University Medical Center*, 122 B.R. at 929 ("It would be a distortion of the record to conclude that overpayment for Medicare services performed in 1985 are a defense to a claim for reimbursement for unrelated services provided in 1988"); *Lee*, 739 F.2d at 875 ("[T]he fact that the same two parties are involved, and that a similar subject matter gave rise to both claims ... does not mean that the two arose from 'the same transaction'").

### C.

A claim secured by setoff "elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, prepetition claim against the creditor." *Lee*, 739 F.2d at 875. A claim secured by setoff "thereby receives a permissible preference over other [unsecured] creditors." *In re American Central Airlines, Inc.*, 60 B.R. 587, 590 (Bankr.N.D.Iowa 1986). *See* 11 U.S.C. § 506(a).[14]

■ The issue here is whether the Secretary has a right of setoff in the disputed payments. Sec'y brief at 7–10, 16–20. According to the Bondholders Committee and the Indenture Trustee, their security interests in accounts receivable take priority over any setoff right the Secretary may have in medicare underpayments. Indenture Trustee brief at 13–17. The bankruptcy court concluded that either under federal common law or Pennsylvania U.C.C. law the Secretary's interest was senior to the security interests of the Bondholders Committee and the Indenture Trustee. *See Metropolitan*, 110 B.R. at 741.[15]

---

**13.** "[I]n the case of recoupment, there is no prohibition against applying post-petition payments due to the debtor to reduce a pre-petition debt owed by the debtor." *Westinghouse*, 63 B.R. at 20.

**14.** "An allowed claim of a creditor secured by a lien on property in which the estate has an interest or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff...." 11 U.S.C. § 506(a).

**15.** It is unnecessary to decide whether federal common law or state law governs this dispute because, in either case, the result is the same. State law, as an independent source of authority or as incorporated through federal common law, is used to determine priority of private liens arising from government lending programs in the absence of applicable federal law governing the disputed issue. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 729, 99 S.Ct. 1448, 1459, 59 L.Ed.2d 711 (1979) ("State law may be incorporated as the federal rule of decision [because] state commercial codes furnish convenient solutions in no way inconsistent with adequate protection of the federal inter-

Section 9–318 of the U.C.C., as adopted in Pennsylvania, establishes the rights and the defenses available to an assignee and an account debtor.[16] Under § 9–318(a)(1) the Secretary may assert against the Bondholders Committee and the Indenture Trustee any defense that it possesses against Metropolitan, arising under the provider agreements or the medicare statute. 13 Pa.C.S.A. § 9318(a)(1).

The medicare statute permits the Secretary to adjust present payments to account for overpayments. *See* 42 U.S.C. § 1395g.[17] The Secretary may make this adjustment against the Bondholders Committee and the Indenture Trustee because they are assignees of Metropolitan's medicare rights and obligations. *See, e.g., K–Mart Corp. v. First Pennsylvania Bank,* 16 Pa.D. & C. 3d 509, 512, 517 (C.P.Phila.1980) (right to recover overpayments made for defective goods "is not lost [as plaintiff contended] because of the assignment of [a security interest in] the accounts receivable, but rather the assignee is liable to return such overpayments"). *See also Phil Greer & Associates, Inc. v. Continental Bank,* 614 F.Supp. 423, 425 (E.D.Pa. 1985) (assignees are subject to setoffs existing prior to notification of assignment, although affirmative claims against assignee that accrue against assignor are not valid). *Cf. H. John Homan Company, Inc. v. Wilkes–Barre Iron and Wire Works, Inc.,* 233 N.J.Super. 91, 558 A.2d 42, 44 (1989) ("[T]he actual value of the

assigned right to payment by the assignor's debtor may be diminished, if not completely vitiated, by the defenses and setoffs available to the debtor") (applying same U.C.C. § 9–318 under New Jersey law, N.J.S.A. 12A:9–318(1)(a)).

Under § 9–318(a)(2) a right of setoff may be asserted if it arises before notification of the account assignment. *See* 13 Pa.C.S.A. § 9318. An assignee merely "stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment." *Septembertide Publishing, B.V. v. Stein and Day, Inc.,* 884 F.2d 675, 682 (2d Cir.1989). *See Gardner v. Surnamer,* 608 F.Supp. 1385, 1391 (E.D.Pa. 1985) ("It is axiomatic that the rights of an assignee can rise no higher than those of the assignor") (citing *Himes v. Cameron County Const. Co.,* 497 Pa. 637, 444 A.2d 98 (1982); *United States Steel Homes Credit Corp. v. South Shore Development Corp.,* 277 Pa.Super. 308, 419 A.2d 785 (1980)); *American East India Corp. v. Ideal Shoe Co.,* 400 F.Supp. 141, 169 (E.D.Pa.1975), *aff'd,* 568 F.2d 768 (3d Cir. 1978). The Bondholders Committee and the Indenture Trustee, as assignees, are limited to those rights that Metropolitan had under the provider agreements.

Moreover, the medicare statute adequately notified the assignees that their rights in future gross revenues would be subject to adjustment to account for prior overpayments. *See Heckler v. Communi-*

---

est"); *United States v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232, 1236–37 (3d Cir.1986).

**16.** Section 9–318 of the U.C.C. provides:

(a) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9–206 the rights of an assignee are subject to

(1) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(2) any other defenses or claim of the account debtor which accrues before the account debtor receives notification of the assignment.

(b) So far as the right to payment or part thereof under an assigned contract has not been fully earned by performance, and not withstanding notification of the assignment, any modification of or substitution for the contract made in good faith and in accordance with reasonable commercial standards is effective against an assignee unless the account debtor has otherwise agreed but the assignee acquires corresponding rights under the modified or substituted contract. The assignment may provide that such modification or substitution is a breach by the assignor. 13 Pa.C.S.A. § 9318.

**17.** § 1395g. **Payments to providers of services**

(a) The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid ... with necessary adjustments on account of previously made overpayments or underpayments. ...

*ty Health Services of Crawford,* 467 U.S. 51, 65, 104 S.Ct. 2218, 2225–26, 81 L.Ed.2d 42 (1984) ("As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement"); *United States v. Markgraf,* 736 F.2d 1179, 1185 (7th Cir. 1984) ("The general rule is that everyone is charged with notice of the contents of our federal statutes"); *Nayak v. Com., Dept. of Public Welfare,* 107 Pa.Cmwlth. 504, 508, 529 A.2d 557, 560 (1987) (enrolled providers in medical assistance program are charged with knowledge of applicable Department of Public Welfare regulations).

Significantly, the Secretary's right to offset overpayments by crediting them against underpayments is mandated by the medicare statute.[18] *See* 42 U.S.C. § 1395g. That provision serves as a limitation on the assignment of the provider payments to be received by the Bondholders Committee and the Indenture Trustee, thereby creating a limitation that legally bound these assignees under § 9–318(a)(2). *See generally American East India Corp.,* 400 F.Supp. at 155 (rights of assignee "are limited to those due to it as a performing assignee" and no independent rights between assignee and initial contracting parties exist); *Glassman Constr. Co. v. Fidelity and Casualty Co.,* 356 F.2d 340, 342 (D.C.Cir.1965), *cert. denied,* 384 U.S. 987, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966) ("[A]n assignee takes the assignment subject to all defenses of the obligor against the assignor, or pledgor, existing before notice of assignment").

Here, the security interests in "gross revenues" were perfected in 1976 and 1981. *See Metropolitan,* 110 B.R. at 732. The Bondholders Committee and the Indenture Trustee were sophisticated lenders that knew, or should have known, the mechanics of the provider-reimbursement provisions of the medicare statute. Inasmuch as this provision of the medicare statute existed prior to 1976, their security interests would not attach until the provisions of the medicare statute were satisfied.[19]

### III.

It should be indisputable that the Bondholders Committee and the Indenture Trustee hold limited security interests, which entitle them only to medicare proceeds validly claimed by the hospital. Therefore, their interests in gross revenues are subject to the Secretary's right to reconcile underpayments and overpayments to the extent that both discrepancies arose prepetition. While the final adjustments occurred postpetition, the provider agreement and the medicare statute authorized such a post-services accounting. None of the offsetting items represent postpetition services, but are merely an adjustment of accounts for prepetition activities.

For these reasons, the Secretary's interest in the overpayments was senior to the Bondholder's and the Indentured Trustee's security interests in gross revenues. The bankruptcy court properly decided to grant nunc pro tunc relief from the automatic stay. 11 U.S.C. § 362(d). *See In re Albany Partners, Ltd.,* 749 F.2d 670, 675 (11th Cir.1984). Its order dated February 14, 1990 will be affirmed.

---

**18.** Appellants contend that the Secretary's subsequently arising setoff cannot take priority over a perfected security interest in receivables, citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son,* 882 F.2d 615, 619 (2d Cir.1989) and *Griffin v. Continental American Life Insurance Co.,* 722 F.2d 671, 672 (11th Cir.1984). Inasmuch as the Secretary's statutory right to offset overpayments, as mandated by 42 U.S.C. § 1395g, arose prior to appellants' security interests, *MNC* and *Griffin* do not apply. *Compare MNC,* 882 F.2d at 630 (contract constituting setoff was "collateral agreement regarding the method of payment").

**19.** On June 13, 1966 Metropolitan Hospital entered into the medicare provider agreement. *See Metropolitan,* 110 B.R. at 732. The medicare statute governing the overpayment procedure, 42 U.S.C. § 1395g, was enacted in 1965. *See* P.L. 89–97 § 1815, 1965 U.S. Code Cong. & Admin.News 305, 318, 2103.