**In re MONSOUR MEDICAL CENTER, formerly Monsour Hospital & Clinic, Inc., Debtor.**

**BLUE CROSS OF WESTERN PENNSYLVANIA, A Pennsylvania non-profit corporation, Plaintiff,**

v.

**MONSOUR MEDICAL CENTER, Monsour Hospital & Clinic, Inc., Defendant and Third-Party Plaintiff,**

v.

**UNITED STATES of America, Third-Party Defendant.**

Civ. A. Nos. 81–462, 81–522.

United States District Court, W. D. Pennsylvania.

June 12, 1981.

Joseph Friedman, John F. Perry, James H. Webster, Springer & Perry, Pittsburgh, Pa., for Blue Cross.

James H. Joseph, Joseph & Restauri, Pittsburgh, Pa., for Monsour Medical Center.

Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., Samuel Teel, Jr., Tax Div., U. S. Dept. of Justice, Washington, D. C., James S. Feight, Jr., Asst. Regional Atty., Region III, Dept. of Health & Human Services, Philadelphia, Pa., for U. S.

## OPINION AND ORDER

TEITELBAUM, District Judge.

In this appeal from a decision of the Bankruptcy Court, this Court is asked to review the Bankruptcy Court's determination of the contractual relationships among the parties. For the reasons set forth below, the Order of the Bankruptcy Court must be affirmed.

On February 22, 1980 Monsour Medical Center (Monsour) filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Pursuant to section 365 of the Bankruptcy Code, 11 U.S.C.A. § 365, Monsour accepted whatever contracts the Bankruptcy Court determined to be in existence and executory between Monsour and Blue Cross of Western Pennsylvania (Blue Cross) and between Monsour and the Department of Health and Human Services (HHS, formerly Health, Education & Welfare) at the commencement of Monsour's reorganization. By Memorandum Opinion and Order dated January 30, 1981, 8 B.R. 606, the Bankruptcy Court found Monsour and Blue Cross were parties to a 1976 executory contract as of February 22, 1980 and that Monsour and HHS were parties to a 1966 agreement in the nature of an executory contract as of February 22, 1980. The Bankruptcy Court approved Monsour's acceptance of both of these contracts. As a result of the Bankruptcy Court's decision, under the accepted contracts, Blue Cross and HHS may reduce current payments to Monsour in order to recover overpayments made before Monsour commenced reorganization. Monsour and the United States of America, acting through the Internal Revenue Service (IRS) as assignee of Monsour, have appealed.[1] Monsour challenges the Bankruptcy Court's finding that the relationship between it and Blue Cross was governed by the *1976* contract; Monsour also challenges the Bankruptcy Court's finding that the relationship between it and HHS was in the nature of an executory contract.

### Blue Cross

The relationship between Monsour and Blue Cross has been detailed in the Memorandum Opinion of the Bankruptcy Court. The basic facts are not in dispute and therefore this Opinion will summarize the relationship between Monsour and Blue Cross as it is relevant to this appeal.

In 1973 Monsour and Blue Cross entered into a contract under which Blue Cross reimbursed Monsour for hospital services provided by Monsour to Blue Cross subscribers. In 1976 Monsour and Blue Cross entered into a new contract which established a new

---

1. The IRS has adopted Monsour's brief. For convenience, reference in this Opinion will be solely to Monsour.

method of reimbursement but incorporated by reference certain provisions of the 1973 contract. Under the 1976 contract Blue Cross made periodic advance payments to Monsour and then, following a year-end determination of reimbursable costs, adjusted its periodic payments to reconcile differences between amounts paid and reimbursable costs. By its terms, the 1976 contract was to expire June 30, 1979. However, in March of 1979 Monsour and Blue Cross orally agreed to continue the 1976 contract until June 30, 1980. This oral agreement was confirmed by a written document in which Monsour selected the method of calculating its periodic reimbursements.

Monsour contends there were three separate contracts between itself and Blue Cross: the 1973 contract, the 1976 contract, and a 1979 contract. Monsour's argument, as this Court understands it, is that the 1976 contract expired by its own terms on June 30, 1979 and the oral agreement, by *operation of law* without regard to the intent of the parties, created a new oral contract for the period from July 1, 1979 to June 30, 1980.[2] Monsour argues that the terms of this 1979 contract were identical to those of the 1976 contract, but that since the 1979 contract was a new separate and distinct obligation, Blue Cross was not permitted to adjust payments made under the 1979 contract to recoup overpayments made under the expired 1976 contract. Monsour argues that the 1979 contract was the only executory contract[3] between it and Blue Cross at the commencement of reorganization proceedings and therefore the only contract which it could accept.

Blue Cross, on the other hand, contends the parties orally and in writing modified the 1976 contract extending its duration until June 30, 1980 and that this 1976 contract was the executory contract between it and Monsour as of the bankruptcy filing. Blue Cross contends, in the alternative, if there were a new 1979 contract, it necessarily included a provision allowing Blue Cross to recoup overpayments made in prior years.

■ Thus, this Court is faced with the issue of determining the legal effect of the oral agreement between Monsour and Blue Cross, as confirmed in writing. The Bankruptcy Court found that Monsour and Blue Cross intended to modify the 1976 contract to extend its duration. The record fully supports this finding; further, there is no evidence of record to support a finding that Monsour and Blue Cross did not intend to modify the duration of the 1976 contract. Both Monsour and Blue Cross were fully knowledgeable that the method of reimbursement required subsequent reconciliation. Blue Cross had overpaid Monsour $397,047. for the fiscal year ending in 1978 and $77,336. for the fiscal year ending in 1979. It stretches the imagination to think that Blue Cross intended to continue periodic advance payments in fiscal 1980 without being able to contractually recover these past overpayments. Blue Cross surely could not have intended to become a general unsecured creditor. These general observations are confirmed by the testimony of a Blue Cross representative. The conduct of both Monsour and Blue Cross after June 30, 1979 further evidences their intention to extend the duration of the 1976 contract. In August of 1979 Monsour consented to Blue Cross's adjustment of current payments to recover past overpayment and in October of 1979 Blue Cross began this adjustment. This Court concludes that Monsour and Blue Cross intended to modify the 1976 contract to extend its duration one year. This modification was orally agreed upon and was confirmed in writing.

Nonetheless, Monsour argues that the agreement to continue the 1976 contract was oral and as such created a new oral contract by operation of law. However, it is far from clear that statements of con-

---

**2.** This argument rests on the premise that the written document in which Monsour selected the method of reimbursement is not legally sufficient to constitute a written modification to the 1976 contract.

**3.** See discussion of executory contracts *infra* at 1018.

tract law found in state court decisions, particularly those dealing with statute of frauds problems, are controlling precedent in the case at bar. On the other hand, *Atchinson, Topeka, and Santa Fe Ry. Co. v. Hurley*, 153 F. 503 (8th Cir. 1907), *aff'd*, 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909), a venerable statement of bankruptcy law, bears a striking resemblance to the matter sub judice and suggests a pragmatic approach to further the policies underlying the Bankruptcy Code. In *Hurley* a coal company had contracted to supply the coal requirements of a railroad, with payment to be made after delivery. The coal company had financial difficulties and the railroad orally agreed to advance payment to the coal company to enable it to continue production. The coal company was adjudicated a bankrupt while an advance payment was outstanding. The bankruptcy trustee assumed the contract with the railroad but argued that the oral agreement to advance money was separate and distinct. The Court of Appeals for the Eighth Circuit rejected the trustee's attempt to distort the relationship between the parties so as to accept only the benefits of the contract and avoid the burdens. The Supreme Court, in affirming, stated at 131–132 "[the railroad] was not engaged in the business of money lending." Neither was Blue Cross.

Assuming arguendo that Monsour's position is correct and there was a new separate 1979 contract between Monsour and Blue Cross, the very cases relied on by Monsour suggest that the recoupment provisions of the 1976 contract would be carried over as a term of the new contract. Monsour quotes from *Knight v. Gulf Refining Co.*, 311 Pa. 357, 360, 166 A. 880, 882 (1933): "Parties may, by subsequent oral agreement, modify a written contract which they previously have entered into. The new contract thus agreed upon is a substitute for the original one in so far as it alters, modifies or changes it." The court in *Knight* goes on to explain, at 360, 166 A. at 882, "when the subsequent oral contract makes only a modification of the prior written one, the terms of the written contract not modified or changed remain effective." Monsour does not suggest that the parties altered, changed, or modified the recoupment provisions of the 1976 contract; Monsour concedes that only the duration of the 1976 contract was modified. Thus, following Monsour's own argument, the recoupment provisions of the 1976 contract remained effective in a 1979 contract.

For all of the foregoing reasons, this Court concludes the 1976 contract as modified governed the relationship between Monsour and Blue Cross at the time of Monsour's reorganization. Monsour accepted this 1976 contract. Adjustments of current payments by Blue Cross are in accord with the terms of the accepted contract and do not violate the provisions of the Bankruptcy Code staying collection of antecedent debts, 11 U.S.C.A. § 362.

### HHS

To participate in the Medicare program, health care providers, such as Monsour, must file an agreement to provide services to Medicare patients without charge. 42 U.S.C.A. § 1395cc. In 1966 Monsour signed a "provider agreement". From 1966 until the time of the bankruptcy filing, and continuing to the present, Monsour has participated in the Medicare program. The financial arrangement between Monsour and HHS is governed by the Social Security Act and regulations and, in relevant part, is similar to the arrangement between Monsour and Blue Cross described above. HHS made periodic advance payments to Monsour and then, following a year-end determination of reimbursable costs, adjusted its periodic payments to reconcile differences between amounts paid and reimbursable costs. HHS had overpaid Monsour $463,153. for the fiscal years ending in 1978 and 1979 and in the fall of 1979, with Monsour's consent, started to adjust current payments to recover this amount. The Bankruptcy Court found Monsour and HHS to be parties to an agreement in the nature of an executory contract; Monsour challenges this finding. Thus the appropriate characterization of the 1966 provider agreement and the relationship between Monsour and HHS presents the second issue on appeal.

■ Section 365 of the Bankruptcy Code, 11 U.S.C.A. § 365, grants a trustee (or debtor in possession pursuant to 11 U.S.C.A. § 1107(a)) the power to assume or reject any executory contract of the debtor. The Code does not define "executory contract". However, the legislative history states:

> Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

H.R.Rep.No.595, 95th Cong., 1st Sess. (1977) at 347, reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6303–4; S.Report No. 989, 95th Cong., 2d Sess. (1978) at 58, reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5844. It is well-settled that if the trustee elects to assume an executory contract, he must accept the contract's burdens as well as its benefits. *Atchinson, Topeka, & Santa Fe Ry. Co. v. Hurley, supra; In re Italian Cook Oil Corp.*, 190 F.2d 994 (3rd Cir. 1951).

■ Monsour attempts to avoid the burden of repaying HHS by arguing that there was no executory contract between Monsour and HHS which it could have accepted. Monsour's argument, as this Court understands it, is that its relationship with HHS was in the nature of a unilateral contract, that is, there was a continuing offer from HHS to reimburse Monsour for Medicare services, but that Monsour could only accept this offer by rendering the services. Each time Monsour provided Medicare services, a separate contract was formed and HHS became obligated to reimburse Monsour. Since there was no performances due from both parties, the argument runs, there was no executory contract between them.

While this argument provides interesting reading, the very stating of the argument makes it obvious that it in no way reflects the reality of the relationship between Monsour and HHS. This Court finds the contractual relationship between Monsour and HHS characterized by mutual obligations: Monsour is obligated to provide services to Medicare patients without charge and HHS is obligated to reimburse Monsour. These mutual obligations may be viewed as growing out of either an express contract (the 1966 provider agreement) or an implied in fact contract (derived from the conduct of the parties).

■ The 1966 provider agreement can be seen as the express contract establishing the mutual obligations of Monsour and HHS. This agreement evidenced Monsour's eligibility to participate in the Medicare program but the terms of this participation were governed by Title XVIII of the Social Security Act (Medicare) and the implementing regulations. Therefore the agreement incorporated by necessary implication the relevant provisions of the Social Security Act and regulations. The agreement provided it could be terminated by either party; however, Monsour has elected to continue participation since 1966. Over the years the dealings between the parties have been governed by the Act and regulations. The conduct of the parties provides ample basis for finding an implied in fact contract from which the mutual obligations of the parties are derived. For present purposes it is not necessary to decide which of these two contract theories underlies the obligations of the parties. Rather, this Court focuses on the performance due from both Monsour and HHS at the commencement of reorganization.

For all of the foregoing reasons, this Court concludes an executory contract governed the relationship between Monsour and HHS at the time of Monsour's reorganization. Monsour accepted this executory contract. Adjustments of current payments by HHS are in accord with the terms of the accepted contract and do not violate the provisions of the Bankruptcy Code staying collection of antecedent debts, 11 U.S.C.A. § 362.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). An appropriate Order shall issue.