**In re UNIVERSITY
MEDICAL CENTER**

v.

**Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services.**

**Civ. A. No. 89–0411.**

United States District Court,
E.D. Pennsylvania.

Dec. 28, 1990.

Thomas Tropp, Mesirov, Gelman, Jaffe, Cramer & Jamieson, William Frey, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for University Medical Center.

Virginia Powel, Asst. U.S. Atty., Bevery Dennis, III, Office of the Gen. Counsel, Dept. of Health & Human Services, Rich-

ard Gorelick, David Bongiovanni, Joseph Simmons, Deputy in Charge of Bankruptcy Operations, Philadelphia, Pa., for Louis W. Sullivan.

## OPINION

### GAWTHROP, District Judge.

This is an appeal by the Secretary of Health and Human Services from a ruling of the bankruptcy court in which the bankruptcy judge found that the Secretary violated the automatic stay provision of the bankruptcy code by acting post-petition to recover pre-petition overpayment made under the Medicare program to the University Medical Center. The Secretary also appeals the bankruptcy court's award of attorneys fees and prejudgment interest. For the following reasons, I shall affirm the decision of the bankruptcy court as to the violation and reverse as to fees and interest.

### BACKGROUND

The University Medical Center, ("UMC"), is a general care hospital that filed a voluntary petition in bankruptcy under Chapter 11 of the United States Code on January 1, 1988 and ceased to do business on March 31, 1988. While in business, UMC provided services to Medicare beneficiaries under an agreement with the United States Department of Health and Human Services, ("HHS"). This "Provider Agreement", executed in 1966 between the Broad Street Hospital and the Secretary of Health, Education and Welfare—the predecessors in interest to UMC and HHS respectively—is similar to provider agreements entered into by hospitals and health care facilities across the country. The authority of the HHS to enter into agreements with health care providers is granted in 42 U.S.C. § 1395cc. By signing the Provider Agreement, Broad Street Hospital/UMC agreed to charge Medicare beneficiaries only as allowed by statute and to comply with civil rights laws in providing services, in exchange for eligibility to receive payment under Title XVIII of the Social Security Act for services provided to Medicare patients.

HHS reimburses Medicare providers through a fiscal intermediary on a periodic basis. The statute provides that payments be made at least once a month and otherwise at the discretion of HHS. 42 U.S.C. § 1395g(a). The usual method is for the intermediary to make periodic interim payments to providers upon application of the provider at the discharge of each Medicare patient. Payments made are estimates of actual expenditures. The intermediary conducts an annual audit of the actual expenditures of each provider to determine whether the provider has been overpaid or underpaid across the year. HHS is authorized to adjust current payments to account for the prior overpayment or underpayment. 42 U.S.C. § 1395g(a).

On January 8, 1988, one week after UMC's bankruptcy filing, Blue Cross of Greater Philadelphia ("Blue Cross"), UMC's fiscal intermediary, informed UMC by letter that UMC had been overpaid by $276,042.00 for Medicare services provided in 1985. The letter stated that Blue Cross would begin 100% withholding of interim payments that became due unless UMC made repayment or agreed to a long-term repayment schedule. UMC did not respond. On February 8, 1988, Blue Cross sent a second letter, again stating that 100% withholding of interim payments would begin unless other arrangements for return of the overpayment were made. On February 18, Blue Cross withheld a $58,000 payment.

In response to the withholding, officials of UMC met with a Blue Cross representative and orally agreed to provide Blue Cross with documentation demonstrating UMC's need for an extended repayment schedule, and, in the interim, to repay the 1985 overpayment at a rate of $15,000 per month over a period of 18 months. UMC officials apparently consented to this arrangement to keep Medicare revenues flowing, which the hospital needed to meet its payroll obligations. On March 4, 1988, UMC issued a $15,000 check to Blue Cross, after which Blue Cross released the $58,-000 it had withheld. However, UMC then failed to provide Blue Cross with the documentation of need, and on March 28, 1988, Blue Cross announced that it would resume 100% withholding.

HHS, through Blue Cross, withheld over $312,000, including the $15,000 payment, in claims by UMC for Medicare services which had been provided after UMC filed the bankruptcy petition. Meanwhile, Blue Cross determined that, in addition to the 1985 overpayment, UMC had been overpaid by $470,894 in 1986 and $65,447 in 1987.

## PRIOR PROCEEDINGS

UMC brought an adversary proceeding against HHS in bankruptcy court on June 17, 1988, alleging that HHS's actions, in demanding payment for previous overpayment, and in withholding current payments to recover the amounts overpaid, violated the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362. Defendant answered by claiming the affirmative defense of contractual recoupment, as well as by filing a separate motion for relief from the automatic stay.

The bankruptcy judge resolved this dispute by finding that HHS's demand for return of overpayment in exchange for continued Medicare payments violated the anti-discrimination provision of the bankruptcy statute, 11 U.S.C. § 525(a).[1] In doing so, the bankruptcy judge relied heavily on his opinion in an unrelated case, *In re St. Mary Hospital*, 89 B.R. 503 (Bankr.E.D.Pa. 1988), which was decided while the present action was pending. *St. Mary Hospital* also involved a Medicare provider that had filed under Chapter 11 and had been overpaid by HHS. In that case, the same bankruptcy judge found § 525(a) to apply to the Secretary's withholding of interim payments and granted an injunction preventing this withholding. *Id.*, at 512. HHS appealed the *St. Mary Hospital* ruling. On appeal of that case and in the present action, HHS continued to assert that withholding was proper.

On December 7, 1988, the bankruptcy court followed *St. Mary Hospital* and ruled in the case at bar that HHS's withholding of Medicare payments from UMC violated the automatic stay provision. *In re University Medical Center*, 93 B.R. 412, 416–417 (Bankr.E.D.Pa.1988). Finding withholding to be impermissible under § 525(a), the bankruptcy judge also refused to grant relief from the stay under 11 U.S.C. § 362(d), and thus he ordered HHS to return to UMC the $15,000 payment made by UMC in accord with the tentative repayment agreement, and to pay UMC the amount that UMC was due for post-petition Medicare services. *Id.* at 417–18. The court also awarded UMC prejudgment interest and attorneys' fees, finding that HHS's pressing of the litigation after *St. Mary Hospital* was a wilful violation of the court's interpretation of the statute. *Id.* at 418–19.

On appeal to this court, Judge Ditter vacated the bankruptcy judge's order in *St. Mary Hospital*, disposing of the action by approving a settlement agreement between the parties and without reaching the merits of the case. I now reach the merits of the withholding controversy in the confines of the UMC appeal, and I find that HHS's withholding there was improper.

## DISCUSSION

■ The district court has jurisdiction to hear appeals from final decisions of the bankruptcy court under 28 U.S.C.A. § 158(a). On review, the court accepts the factual findings of the bankruptcy court unless the findings are clearly erroneous. *In re Jersey City Medical Center*, 817 F.2d 1055, 1059 (3d Cir.1987); *In re Morrissey*, 717 F.2d 100, 104 (3d Cir.1983). On the other hand, the district court independently reviews questions of law. *In re Jersey City Medical Center*, 817 F.2d at 1059.

With these standards of review in mind, I turn to the precise question presented: did

---

1. That provision reads, in pertinent part, that:
 ... *a governmental unit may not* deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, *discriminate with respect to such a grant against*, deny employment to, terminate the employment of, or discriminate with respect to employment against, *a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act ... solely because such bankrupt of debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act ...*
 11 U.S.C. § 525(a) (emphasis added).

the bankruptcy court err, as a matter of law, in finding the Secretary's withholding of interim Medicare payments to be in violation of the automatic stay? I find that it did not.

Resolution of this issue depends upon how one characterizes legally the right of HHS to recover overpayment under the Provider Agreement. UMC argues that the overpayment created a discrete, distinct debt, which HHS acted unlawfully to recover by withholding funds owed to UMC under a separate obligation. HHS counters that obligations to repay overpayment and to reimburse are not distinct, and that it did not withhold the funds in order to offset a debt, but rather to determine under the contract the amount that was due to UMC. Before deciding which characterization is accurate, it is necessary to address why a characterization of the debt is critical.

## I. Decision of Bankruptcy Court

The bankruptcy court avoided the issue of characterization by determining HHS's withholding to be unlawful under § 525(a). See 93 B.R. at 416–417. The court reasoned that HHS's insistence ôn recoupment before making interim Medicare payments constitutes discrimination against UMC because of its status as a debtor in bankruptcy. See St. Mary Hospital, 89 B.R. at 512; University Medical Center, 93 B.R. at 416. The court did not find that HHS asserted the right to recoupment differently, depending on whether Medicare providers were or were not in bankruptcy. Instead, the bankruptcy court held that dissimilar treatment between bankruptcy debtors and similarly situated persons is not necessary for there to be a § 525(a) violation. See St. Mary Hospital, 89 B.R. at 512.

The bankruptcy court relied on an analogy between Medicare recoupment cases and cases where government units were found to be in violation of § 525(a) for denying debtors the right to bid on government contracts and for evicting debtors from public housing units. See e.g. In re Son–Shine Grading, Inc., 27 B.R. 693 (Bankr.E.D.N.C.1983) (discrimination in government contracting); In re Szymecki, 87 B.R. 14 (Bankr.W.D.Pa.1988) (discrimi-

nation in public housing). The court noted that in these cases the government did not treat bankrupt debtors differently from others facing similar financial hardship, since the government would have denied the right to bid to any contractors in "financial straits", and would have evicted any tenant owing back rent. See St. Mary Hospital, 89 B.R. at 512. The bankruptcy court concluded that the significant factor in these cases was not that the government treated the bankrupt parties dissimilarly, but rather that the government attempted to collect a debt that would otherwise be discharged in bankruptcy proceedings. Id. Accordingly, in the case at bar, the bankruptcy court found that HHS violated § 525(a) because it attempted to recover overpayments from a bankruptcy estate.

■ This analogy is probably overdrawn. It may be true in the government-contract and public-housing cases that the government did not treat the bankrupt debtors differently from debtors who had not filed in bankruptcy, but were in similar financial trouble. Yet the government did treat the bankruptcy debtors differently from contractors and tenants who were not in bankruptcy and not eligible to file. It is this type of dissimilar treatment that § 525(a) was designed to prohibit, and this type of dissimilar treatment that appears to be missing in the case at bar. Medicare provider agreements give HHS the authority to adjust interim payments to account for previous overpayment in all cases, whether or not the provider is in bankruptcy or insolvent. It is, no doubt, an interesting coincidence that HHS happened to have waited until after UMC filed for bankruptcy in 1988 before attempting to exercise its right to recover a debt that arose in 1985. But there are no allegations or findings in the record that the present withholding was motivated by discrimination. Such a finding would appear to be necessary to make out a § 525(a) violation in this case. Nevertheless, I need not remand for factfinding on this issue, as I find the withholding to be unlawful on other grounds.

II. *Law Governing Withholding*

A. Automatic Stay and Recoupment Exception

■ The automatic stay provision of the bankruptcy code becomes effective upon a debtor's filing of a bankruptcy petition. 11 U.S.C. § 362(a). The stay prohibits creditors from taking any actions, judicial or extra-judicial, outside of the bankruptcy proceeding to recover amounts owed by the debtor. 11 U.S.C. § 362(a). This purpose of the stay is to give the debtor breathing room and allow for the equitable and organized hearing of all creditors. *See Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267, 271 (3rd Cir. 1984); *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel*, 682 F.2d 446, 448 (3rd Cir.1982).

■ The stay applies to actions by creditors to set off post-petition obligations against pre-petition claims. Although the code allows the set-off of mutual debts where both arose pre-petition, 11 U.S.C. § 553(a), it does not allow set-off where the creditor's debt to the debtor arises after the debtor filed for bankruptcy. *Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir 1984). The stay would thus appear to cover the Secretary's decision to set off pre-petition overpayment against its obligation to provide reimbursement for post-petition Medicare services. HHS does not argue that any of the statutory exceptions to the stay, *see* 11 U.S.C. § 362(b), apply to this case.

■ However, HHS does seek the protection of a common law exception; it argues that the reason why the stay is inapplicable in this case is that the withholding is not a setoff, but rather is based on a contractual right to recoupment. The Third Circuit has recognized the existence of an equitable recoupment doctrine distinct from the setoff doctrine provided by § 553(a) of the bankruptcy code. *See Lee*, 739 F.2d at 875. Unlike setoff, which can apply to unrelated obligations, recoupment applies where the creditor's claim against the debtor arises from the same transaction as the debtor's claim and is "essentially a defense to the debtor's claim … rather than a mutual obligation". *Lee*, 739

F.2d at 875. This doctrine allows a creditor to recoup against a pre-petition debt, despite the automatic stay, for reasons sounding in equity. It is deemed inequitable, when a single transaction is at issue, to allow a debtor to cut off a creditor's defense and thus recover an amount greater than what the debtor is due under the transaction, simply because the defense arose pre-petition and the claim arose post-petition. *Id.*

UMC argues that this court should not recognize an exception to the automatic stay that is not provided in the statute. In *Lee*, the Third Circuit explained the origin of recoupment, noted that the doctrine was "adopted in bankruptcy … by decision", 739 F.2d at 875 (citing *In re Monongahela Rye Liquors*, 141 F.2d 864 (3rd Cir.1944), and ultimately held that it was not applicable on the facts presented. 739 F.2d at 876. UMC contends that the failure of the Third Circuit in *Lee* to specifically authorize recoupment in bankruptcy leaves me free to reject it and adopt the "better reasoned" view of other cases rejecting a recoupment exception to the stay. *See* Brief of Appellees at 19 (citing *In re Memorial Hospital of Iowa County*, 82 B.R. 478 (W.D.Wisc.1988).

■ However, even if I were to accept the argument that *Lee* leaves this court free to reject recoupment, I cannot accept the claim that this position is the better-reasoned view. UMC argues that the recoupment exception provides certain creditors with a self-help remedy that is inconsistent with the general purposes of the automatic stay in providing temporary relief to the debtor and equal treatment of creditors. *See* Appellees Brief at 18–23 (citing *Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267 (3rd Cir.1984); *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel*, 682 F.2d 446 (3rd Cir.1982)). But this argument fails to confront the rationale behind the recoupment exception. The automatic stay applies to claims against the debtor and the property of the debtor's estate. *See* 11 U.S.C. § 362. Recoupment, however, does not allow a creditor to service a

claim against the bankrupt estate; rather, it prevents the debtor from asserting unmerited claims against the creditor to improperly augment that estate. As the Third Circuit recognized in *Monongahela Rye Liquors*, "recoupment in bankruptcy derives from that rule that the trustee takes the bankrupt's property subject to the equities therein". 141 F.2d at 869. Thus, recoupment is about preventing debtors from receiving more than that to which they are entitled, not about allowing individual creditors to settle their claims in advance of others. *See also* 3 Collier on Bankruptcy § 553.03 at 553-13-14 (15th Ed.) (in recoupment, "there is not an element of a preference ... but merely an arrival at·a just & proper liability on the main issue".)

### B. Contractual v. Statutory Recoupment

In the bankruptcy court proceedings, the judge refused to hold that HHS was in fact pursuing a contractual right to recoupment. *University Medical Center*, 93 B.R. at 415. While assuming HHS's withholding to be based on the Provider Agreement and deciding the case on the basis of this assumption, the court expressly reserved the option of finding that the recoupment was instead a matter of statutory right. *Id.* at 415-416.

If HHS's right to recoupment were based on the statute and not the Provider Agreement, the automatic stay would prevent withholding under the Third Circuit's holding in *Lee*, 739 F.2d at 870. In *Lee*, the Third Circuit held that the automatic stay prevented the Social Security Administration from reducing a recipient's monthly old age benefits to account for previous overpayment. 739 F.2d at 876. The Third Circuit rejected the government's attempt to avoid the stay on the theory of recoupment, finding that recoupment was a defense only to actions under contracts, and that the recipient's right to benefits was a statutory entitlement, not a contractual one. *Id.*

The present case is distinguishable. Although HHS's authority to reimburse Medicare providers and to recover overpayment is granted by statute, 29 U.S.C. § 1395g(a), UMC qualifies as a Medicare provider not by the statute but by the Provider Agreement. The statutory payment provisions are incorporated into the Provider Agreement through the clause that promises payment in accord with the provisions of the Social Security Act. The relationship between UMC and HHS is thus properly regarded as contractual. Having determined that HHS has a contractual right to withholding, and that the law recognizes a recoupment exception to the automatic stay, I must still determine whether the contractual right to withholding was applicable in the post-petition context, and whether the recoupment exception was properly asserted on these facts.

### C. Impact of Provider Agreement

■ UMC argues that the Secretary's withholding is subject to the stay even if the Provider Agreement allows for recoupment, because this agreement was not assumed by UMC under 11 U.S.C. § 365, and thus does not govern the post-petition relationship between the parties. Section 365 of the bankruptcy code gives a trustee in bankruptcy the power to assume or reject any executory contract to which the debtor is a party. 11 U.S.C. § 365. An executory contract is "a contract 'on which performance remains due to some extent on both sides.'" *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522, n. 6, 104 S.Ct. 1188, 1194, n. 6, 79 L.Ed.2d 482 (1984) (citing H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 347 (1977) *reprinted in* 1978 U.S. Code Cong. & Ad.News, 5787, 6303-6304); *accord In re Zenith Laboratories*, 104 B.R. 667, 672 (Bankr.D.N.J.1989). Medicare provider agreements are executory in nature, calling for future performance by both parties until either party requests termination, and thus are subject to § 365. *See e.g. In re Tidewater Memorial Hospital*, 106 B.R. 876, 883 (Bankr.E.D.Va.1989) and *In re Memorial Hospital*, 82 B.R. 478, 481 (W.D.Wisc.1988) (both treating provider agreements as executory contracts).

■ If UMC had assumed its Provider Agreement, the automatic stay would not be applicable to withholding undertaken

pursuant to the agreement. A debtor cannot assume a contract's benefits and at the same time reject the contract's burdens. *See Bildisco*, 465 U.S. at 531, 104 S.Ct. at 1199 (debtor assumes contract "cum onere") (citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 996 (3rd Cir.1951)). Thus, where a provider agreement is assumed by a provider in bankruptcy, the provider must accept the burdens of withholding to recover overpayment. *See In re Monsour Medical Center*, 11 B.R. 1014, 1018 (W.D. Pa.1981) (where *Medicare* provider agreement is assumed, withholding is permissible). Further, UMC could not have continued indefinitely as a Medicare provider without assuming the contract, or rejecting it and entering into a new one. A debtor under Chapter 11 must elect to assume or reject any executory contract by the time a reorganization plan is confirmed, or, upon motion by the creditor, at an earlier time specified by the court. 11 U.S.C. § 365(d)(2).

■ UMC continued as a provider after filing in bankruptcy and negotiated with HHS for a long-term repayment schedule to settle the overpayment debt. Both actions are consistent with an intent to assume the Provider Agreement. Yet UMC never took formal steps to assume this contract, and HHS never filed a motion to force UMC to do so. Section 365 provides that the power to accept or reject executory contracts is "subject to court approval". 11 U.S.C. § 365(a). Although some courts have suggested that parties can assume a Medicare provider agreement through their actions without court approval, *see In re Advanced Professional Home Health Care, Inc.*, 94 B.R. 95, 96 (E.D. Mich.1988); *In re Provident Hospital & Training*, No. 87 B 11069, slip op. (Bankr. N.D.Ill.1988); the plain language of § 365 provides that absent the supervision and ultimate approval of the bankruptcy court, an assumption of a provider agreement is ineffective. *See Memorial Hospital*, 82 B.R. at 483 (an exception to requirement of court approval would nullify unambiguous language of code); *see also In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427, 434 (Bankr.S.D.N.Y.1982) *aff'd* 34 B.R. 385 (S.D.N.Y.1983) (debtor's right to assume

provider agreement is clearly conditioned upon obtaining court's consent). The bankruptcy court properly held that because court approval was absent, the Provider Agreement between HHS and UMC was not assumed.

■ The significance of this nonassumption, however, is subject to debate. UMC argues that absent assumption of the Provider Agreement, HHS cannot effect a recoupment without violating the stay. At least one court has so held. *See Memorial Hospital*, 82 B.R. at 478. The court there held that bankruptcy court approval is required before a party may collect prior overpayment under any executory contract, including Medicare provider agreements. *See id.* at 480. The court reasoned that by requiring bankruptcy court approval of executory contracts, *see* 11 U.S.C. § 365(a), and by providing a means for parties to petition the bankruptcy court for relief from the automatic stay, *see* 11 U.S.C. § 365(d), Congress intended for bankruptcy courts to supervise the determination of whether a contract is executory and whether the contract implicates setoff or recoupment. *See Memorial Hospital*, 82 B.R. at 484.

I respectfully disagree. To hold that a contract must be assumed before a creditor can affect a right to recoupment would substantially negate the purpose of the recoupment doctrine. The right to recoupment is not dependent on the reservation of such in a contract clause. *See In re B & L Oil Co.*, 782 F.2d 155, 159 (10th Cir.1989). Rather it is an equitable right to interpose a defense whenever a bankrupt asserts a claim under a contract or with regard to a given transaction. To make this right dependent on the option of the bankrupt through the assumption doctrine makes no sense logically and would make the right meaningless in many situations.

Since the Supreme Court's ruling in *Bildisco*, it has been clear that debtors in bankruptcy are not bound to all the obligations of executory contracts before these contracts are assumed. The Court in *Bildisco* specifically held that an employer who filed under chapter 11 was not re-

quired to make payments to an employee pension fund as required by a collective bargaining agreement. 465 U.S. at 531, 104 S.Ct. at 1199. At the same time, however, the court held that an employer that continues to accept the services of its workers is required to make reasonable payment for those services, and that the terms of the contract are a guide to what is reasonable. *Id.* The overarching principle of *Bildisco* is that in the period between a bankruptcy filing and before assumption or rejection of executory contracts, equity controls the relationship between the debtor and the creditors when performance under the contract is continued.

The recoupment context is factually different from that addressed in *Bildisco*. In *Bildisco* a debtor was held to be liable for the reasonable value of services that it continued to accept under a contract it had not assumed. 465 U.S. at 531–532, 104 S.Ct. at 1199. In recoupment, the reverse is true. The debtor continues to perform under an unassumed contract in anticipation of having the creditor accept the services. In these circumstances, where a debtor is forcing continued performance under a contract that it is not willing to assume, it would be inequitable to have the creditor pay for the full value of post-petition services without regard to payments made or defenses arising under the contract before the bankruptcy filing.

The majority of courts to address the issue of recoupment in the Medicare context have held that recoupment applies regardless of whether the provider has assumed the provider agreement. *See Advanced Professional*, 94 B.R. at 97; *In re Tidewater Memorial Hospital*, 106 B.R. 876 (Bankr.E.D.Va.1989); *Provident*, No. 87 B 11069, slip op. at 5 (Bankr.N.D.Ill. 1988); *Yonkers*, 22 B.R. at 435. These opinions are based on the equitable principle that a Medicare provider cannot receive the benefits of a provider agreement without accepting the burden of recoupment, regardless of whether the provider agreement was formally assumed. *Yonkers*, 22 B.R. at 435; *Advanced Professional*, 94 B.R. at 97 (by continuing as Medicare provider, hospital necessarily assumed agreement and was thus subject to recoupment);

*Tidewater*, 106 B.R. at 884 (court will not grant injunction against withholding in period before assumption or rejection of contract); *Provident*, —— B.R. —— (application of Medicare recoupment in pre-assumption period is consistent with *Bildisco* ).

To the extent that these cases hold that the recoupment exception to the automatic stay applies in the period between bankruptcy filing and assumption of an executory contract, I concur. However, to the extent that they hold that withholding of interim payments under Medicare provider agreements falls within common law recoupment, I must dissent. None of these cases acknowledge a distinction between common law recoupment and the contractual right to recover overpayment under Medicare provider agreements, and thus do not specifically address whether common law recoupment should apply. Upon an examination of the nature of the overpayment debt under Medicare provider agreements, I find that the recoupment doctrine is inapplicable in the Medicare context.

E. Characterization of Claim

The defining feature of a recoupment, as explained above, is that the creditor's claim is essentially a defense to the debtor's claim. More than mutuality of obligation is required. That a debtor owes money to a creditor on a pre-petition obligation is not a defense to the debtor moving against the creditor on a post-petition claim. *Lee*, 739 F.2d at 875 (interpreting 11 U.S.C. § 553(a)). To be a defense, the creditor's claim must bear on the question of whether the debtor is owed what the debtor asserts it is owed on a given transaction.

Two prototypical cases are *In re Midwest Service and Supply Co., Inc.*, 44 B.R. 262 (D.Utah 1983) and *Waldschmidt v. CBS, Inc.*, 14 B.R. 309, 314 (M.D.Tenn.1981). *Midwest Service and Supply* involved a series of service and repair contracts between a service contractor and the Department of the Army that called upon the contractor to overhaul and repair heavy equipment, and allowed the contractor to

bill the government periodically for work in progress. After the contractor filed in bankruptcy, the government discovered that advance payments made on some of the contracts exceeded the value of labor performed. When the contractor completed work post-petition and presented a final bill on these contracts, the Army adjusted payment downward to account for the previous overpayment. The contractor filed a motion to hold the Army in contempt for violating the automatic stay. The district court held that the Army's actions were proper under the doctrine of recoupment, because the Army was "simply applying the progress payment cause to the single transaction to determine how much [the contractor] was due". 44 B.R. at 266.

*Waldschmidt* involved a royalties agreement between a recording company and a recording artist. The recording company made advance payments under the agreement before the release of the artist's album and before the artist's bankruptcy filing. After the musician filed in bankruptcy, the recording company withheld royalties from actual record sales to recoup the amount of the advancements. The court allowed this withholding, finding that the advancement and the claim for royalties arose out of the same transaction. 14 B.R. at 314. *Waldschmidt* and *Midwest Service and Supply* are thus similar in the following respects: in both cases the debtor possessed a claim that accrued post-petition against the creditor, yet in both cases the creditor was allowed to withhold payment on the claim to the extent that payment on the same transaction had been made pre-petition.

The present case is distinguishable. Here the pre-petition overpayments were made with respect to transactions separate from those on which the debtor sought post-petition payment. It would be a distortion of the record to conclude that overpayment for Medicare services performed in 1985 are a defense to a claim for reimbursement for unrelated services provided in 1988. HHS does not contend as much. HHS does assert, however, that the focus should not be on the separate transactions, but on the contract as a whole, and the fact that all transactions were made under the

one Provider Agreement. The Third Circuit in *Lee* recognized that the recoupment doctrine in bankruptcy has been applied primarily where the offsetting claims of creditor and debtor "arise out of the same contract", 739 F.2d at 875. HHS argues that *Lee* authorizes recoupment anytime the claims of debtor and creditor originate in the same instrument.

In support of its position, HHS offers the Tenth Circuit's opinion in *B & L Oil.* 782 F.2d at 155. This case involved an oil division order, in which the creditor obtained the right to purchase all or any part of the oil pumped by the debtor from a given leasehold. After filing in bankruptcy, the debtor continued to deliver oil to the creditor, yet the creditor withheld a portion of the payment for this oil to account for an overpayment made on deliveries before the bankruptcy filing. The district court in the case held that this withholding was not justified as a recoupment because each delivery and acceptance constituted a separate transaction. The Tenth Circuit reversed, holding that the oil division order was a single contract subject to recoupment. 782 F.2d at 158–159.

I decline to follow *B & L Oil,* for two reasons. First, the court's holding stretches the doctrine of recoupment beyond its equitable foundation. The court allowed recoupment despite finding that the creditor's claim to its overpayment was *"not* 'essentially a defense' " to the debtor's claim to be paid on post-petition deliveries. If a creditor's claim is not a defense but rather a separate debt, the rationale for allowing recoupment does not exist.

Second, the *B & L Oil* court's reasoning for stretching the recoupment doctrine is unpersuasive. The court simply states that other cases have allowed recoupment in similar situations, citing *Waldschmidt,* 14 B.R. at 309, and *Yonkers,* 22 B.R. at 427, 433. Yet *Waldschmidt* is not similar. In *Waldschmidt,* the pre-petition payments were simply advancements of the same royalties the debtor sought to recover post-petition, while in *B & L Oil,* the overpayment related to a transaction different from that on which the debtor staked its post-petition

claim. The *Yonkers* case, on the other hand, is one of the several Medicare cases noted above that allowed withholding of interim payments under the label of recoupment. *See also Advanced Professional*, 94 B.R. at 97; *In re Tidewater Memorial Hospital*, 106 B.R. 876 (Bankr.E.D.Va. 1989); *Provident*, No. 87 B 11069, slip op. at 5 (Bankr.N.D.Ill.1988). The authority of these cases at bar is unpersuasive, for reasons already stated.

Further, even if *B & L Oil* were controlling, it is distinguishable. The Tenth Circuit explained that *B & L Oil* was not a case where the creditor "consciously made a loan, extended credit, or *made payment required by a contract*, as did the bankrupt's ordinary creditors," but rather the creditor made the overpayment by "mistake". 782 F.2d at 159 (emphasis added). On this ground, favored status for the creditor was in accord with the equitable nature of the recoupment doctrine. *Id.* In the present case, the overpayments were not mistakes as much as they were payments required by the Provider Agreement and the procedures for reimbursement established under this agreement.

The Provider Agreement is a unique type of contract. It does not provide for a defined transaction or even a series of transactions. It simply establishes a relationship between the parties: if UMC treats eligible patients, HHS will reimburse them for their costs. Under the agreement, the parties established an arrangement for payment, with HHS providing reimbursement with respect to each patient treated. The arrangement called for the payments to be estimates and thus contemplated that over time an overpayment or underpayment might result, creating a debt in one or the other party. The arrangement called for this debt to be calculated on an annual basis. The result is that the overpayment debt presently owed by UMC is distinct from and bears no direct relation to the particular claims for reimbursement for services performed post-petition. The Provider Agreement authorizes the adjustment of interim payments to account for an overpayment debt, yet the Provider Agreement was not assumed. Absent an assumption of the contract's terms, HHS is left to rely on common law recoupment, which simply does not apply in this case. It must be remembered that the question is not whether a debt is owed, but whether HHS should be given preferred status with respect to that debt. I hold that they should not, and thus will affirm the bankruptcy court's order requiring HHS to release the amount of reimbursement owed UMC for services provided post-petition.

### III. *Post–Petition Agreement*

HHS contends that it is entitled to retain the $15,000 received from UMC under their post-petition agreement. Given UMC's failure to provide necessary documentation and HHS's later abandonment of the repayment contract, HHS does not argue that the parties reached a binding long-term repayment agreement. Yet HHS does argue that the release of the $58,000 in exchange for the $15,000 payment, binds the parties to this particular transaction. HHS relies on the provision of the bankruptcy code that allows debtors to continue business operations after bankruptcy filing. *See* 11 U.S.C. § 363(c). This section states that when the debtor is otherwise authorized under the code to continue in operation, the trustee may "enter into transactions ... in the ordinary course of business, without notice or hearing". *Id.*

Section 363(c) cannot support HHS's claim. Since UMC could not agree to a long-term repayment agreement without in effect assuming the Provider Agreement, it would appear that court approval of the agreement was necessary under the specific terms of § 365(a), despite the general language in § 363(c) to the contrary. Further, even assuming § 363(c) controlled, the agreement between the parties cannot be upheld in the face of this court's conclusion, above, that HHS had no authority to withhold interim payments. Since HHS could not lawfully withhold the $58,000, UMC received no consideration for its $15,-000 payment. The bankruptcy court thus properly held that the $15,000 must be returned.

## IV. Attorneys' Fees and Prejudgment Interest

Section 362(h) of the bankruptcy code provides that an "individual injured by any willful violation" of the automatic stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may receive punitive damages". 11 U.S.C. § 362(h). The bankruptcy court awarded attorneys' fees to UMC, yet only for the period between the decision in *St. Mary Hospital* and judgment in this case. The court reasoned that before *St. Mary Hospital*, there was authority in this district and other jurisdictions to support the legality of withholding, yet after *St. Mary Hospital*, HHS "should have gracefully accepted that Opinion as setting forth the applicable law". *University Medical Center*, 93 B.R. at 418–19. The bankruptcy court also assessed prejudgment interest on the payments withheld by HHS as "an aspect of a penalty against HHS" and as a mandatory element of breach of contract damages. *Id.* at 417.

HHS argues that any awards under § 362(h) are inappropriate because that section only authorizes damage awards to individuals, while UMC is a partnership. *See* 2 Collier on Bankruptcy § 362.12 at 362–79. Most courts have rejected this narrow reading and have held that § 362(h) allows damage awards against corporations and other business entities. *See e.g. Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289 (4th Cir.1986); *In re INSLAW, Inc.*, 83 B.R. 89, 165–66 (Bankr. D.D.C.1988); *In re Randy Homes Corp.*, 84 B.R. 799, 802 (Bankr.M.D.Fla.1988). I need not address this issue, as I find that § 362(h) does not apply to this case because the violation by HHS was not "willful" under the meaning of the statute.

In order for the damage awards to be upheld under § 362(h), HHS's violation of the stay must have been willful. UMC relies on a series of bankruptcy court opinions holding that a party willfully violates the stay under § 362(h) whenever the party (1) has knowledge of the bankruptcy filing and (2) intentionally performs an act found to be in violation of the stay. *See In re Littke*, 105 B.R. 905, 910 (Bankr.N.D.Ind. 1989); *In re McLaughlin*, 96 B.R. 554, 559

(Bankr.E.D.Pa.1989); *Aponte v. Aungst*, 82 B.R. 738, 742 (Bankr.E.D.Pa.1988); *and In re Wagner*, 74 B.R. 898, 902 (Bankr.E. D.Pa.1987). *See also In re Knaus*, 889 F.2d 773, 775 (8th Cir.1989) (citing *Aponte* and *Wagner*). Under these opinions, a party's ignorance of the law or good faith belief that his conduct is not covered by the stay is not an excuse to a fee award, as long as the party acted with knowledge that a bankruptcy petition had been filed. *See Littke*, 105 B.R. at 910; *McLaughlin*, 96 B.R. at 560; *Wagner*, 74 B.R. at 904. According to UMC, since HHS knew of UMC's bankruptcy filing and since HHS's withholding was intentional, HHS's violation of the stay was willful, regardless of whether it acted upon a good faith reading of the law.

HHS in turn relies on an opinion by the Third Circuit holding that a party cannot be found in contempt for violating the automatic stay where the law regarding the application of the stay is ambiguous. *See I.R.S. v. Norton*, 717 F.2d 767, 774 (1983). In *Norton*, the Third Circuit overturned an order finding the Internal Revenue Service in contempt for violating the automatic stay, because the question of whether the IRS violated the stay by withholding tax overpayment to be set off against pre-petition tax debts was "much litigated and controversial", making the law unclear at the time of the government's action. *Id.* at 774–775. The court stated that a party should not be held in contempt under an ambiguous provision unless first given "fair warning" by the courts that the activity is forbidden. *Id.* at 774.

*Norton* was decided before the enactment of § 362(h), *see* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, when civil contempt was the typical remedy sought by parties damaged by violation of the automatic stay. *See Wagner*, 74 B.R. at 902. UMC thus argues that *Norton* has no relevance in determining whether a violation was willful within the meaning of the statute. Recognizing the parallel between civil contempt and a damage award under § 362(h), I respectfully disagree.

 Civil contempt is a measure imposed to compel compliance with a court order and provide compensation to a party damaged by violation of that order. *See In re Grand Jury Investigation*, 600 F.2d 420, 423 (3rd Cir.1978); *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989). As a remedial measure, civil contempt sanctions are imposed whether or not the offending party acted in good faith or without willfulness or a specific intent to violate a court order. *See McGoff v. Rapone*, 78 F.R.D. 8, 32 (E.D.Pa.1978) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949)). Since § 362(h) literally requires a violation of the automatic stay to be willful before damages can be awarded, this provision can be seen to impose a stricter standard than imposed by civil contempt. Recognizing that such a reading would make § 362(h) superfluous, the court in *Wagner* found that Congress intended this provision to supplement and clarify the contempt remedy and that the state of mind required for both proceedings should be the same. 74 B.R. at 902–03.

UMC would have this court go an additional step and hold that § 362(h) imposes a lesser state of mind requirement than that imposed in civil contempt proceedings. *See McLaughlin*, 96 B.R. at 558 (holding that *Norton* does not apply to § 362(h)). However, nothing in the language or legislative history of § 362(h) compels this result. *See* 2 Collier § 362.12 at 362–79 (noting absence of legislative guidance). *Norton* does not hold that there is a general good faith defense in a contempt proceeding or that a specific intent to violate a court order must be found in order to hold a party in contempt. Such a holding in the bankruptcy context would only encourage ignorance and create extra litigation. *See McLaughlin*, 96 B.R. at 560. Rather, *Norton* holds that when a party is fully informed of the law and rests its action on a plausible reading of an ambiguity in the law, the party should not be held in contempt when the court ultimately resolves the ambiguity the other way. The same logic holds with respect to finding a party in willful violation of the automatic stay.

*See In re Zunich*, 88 B.R. 721, 726 (Bankr. W.D.Pa.1988) (violation of stay will not be found willful where there was a significant question as to whether a violation occurred). *But see Littke*, 105 B.R. at 911 (violation is willful despite split in authority on issue of violation where party knows of bankruptcy filing and takes risk that court will resolve issue against it).

In the present case, the bankruptcy court recognized that the law regarding HHS's right to withhold interim Medicare payments was not settled at the time of the initial withholding. Indeed, other courts had upheld the right to recoupment under Medicare provider agreements, *see Yonkers*, 22 B.R. at 435, *Monsour*, 11 B.R. at 1014, or had referred to this practice with approval. *See B & L Oil*, 782 F.2d at 158. The bankruptcy court thus restricted its fee award to the period after *St. Mary Hospital* when the law apparently became settled. Nevertheless, despite the restriction, I find that the ruling was error. The bankruptcy court decided *St. Mary Hospital* on a ground not suggested by any other court that reached or has since reached the issue, and HHS filed a timely appeal. Thus the law of *St. Mary Hospital* remained unsettled when the bankruptcy court made its ruling in this case. The issue is not whether the bankruptcy court made its opinion clear or whether HHS was collaterally estopped from relitigating the withholding issue after *St. Mary Hospital*. The issue is whether the bankruptcy court's opinion in *St. Mary Hospital* so changed the landscape of the law of withholding in this jurisdiction as to make HHS's withholding willful when it was not willful before. To hold in the affirmative would have the result of allowing HHS to continue to assert its withholding rights in *St. Mary Hospital* while preventing the same in the case at bar. I find this to be plainly inconsistent, and will reverse the bankruptcy court's award of attorneys' fees.

 The bankruptcy court's award of prejudgment interest must be overturned on the same ground. While the bankruptcy court did not tie the interest award to

*St. Mary Hospital* or to § 362(h), no other grounds for an award of interest exists. A court may not award prejudgment interest against the United States absent express statutory or contractual authority to do so. *See United States v. Louisiana,* 446 U.S. 253, 100 S.Ct. 1618, 64 L.Ed.2d 196 (1980); *United States v. Thayer–West Point Hotel Co.,* 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947). While section 362(h) might be read to provide the authority to award prejudgment interest against the United States as an element of actual damages, this authority exists only when the violation of the automatic stay is found to be willful. Having found that HHS's violation of the stay was not willful, I am also compelled to reverse the bankruptcy court's order as to prejudgment interest.